516 So.2d 271 (1987)
Markham William DOWELL, Appellant,
v.
STATE of Florida, Appellee.
No. 86-2193.
District Court of Appeal of Florida, Second District.
October 21, 1987.
Rehearing and Rehearing Denied December 7, 1987.
*272 John Charles Coleman of Coleman & Coleman, and Peter D. Ringsmuth of Smith and Ringsmuth, Fort Myers, for appellant.
Robert A. Butterworth, Atty. Gen., Tallahassee, and Joseph R. Bryant, Asst. Atty. Gen., Tampa, for appellee.
Rehearing and Rehearing En Banc Denied December 7, 1987.
LEHAN, Judge.
The defendant appeals from his convictions for armed robbery and first degree murder. We affirm.
The victim was a real estate saleswoman. She was working alone, showing model homes to the public. Physical evidence showed that she was struck on the head while she was near the dining room table in a model home and that she then walked slowly through a hallway and into a bedroom where she was shot twice in the back with a .38 caliber pistol. Two Winchester .38, 110 grain, semi-jacketed, hollowpoint bullets were found at the scene. A large diamond ring and a gold necklace were missing from the victim's body and were never located. The case against the defendant included the following evidence.
On the day of the murder both the state's chief witness and the defendant arrived separately but at about the same time at the model home office for a tour of model homes. Their tour included the model home where the crime occurred. At the trial the witness identified the defendant as the man who had toured the home with him and the victim. When questioned by the police the defendant first denied ever being at the scene of the crime, but he later admitted his presence there. The witness's testimony was that the witness and defendant both signed sales prospect registration cards before taking the tour. Although those cards were not found, the defendant admitted that he had signed the card with a false name.
At the end of the tour the witness left the model home while the defendant remained there alone with the victim. The witness contacted the police the next day *273 when he learned of the crime from a newspaper. He gave the police a description of the defendant and specifically recalled that the defendant was wearing gray, thin-soled loafers with gold trim.
Prior to the tour the witness had been biking in the area. Based upon the time he left another particular location he estimated his and defendant's time of arrival at the model home office as at about 12:45 p.m. The tour, according to the witness, took about twenty to thirty minutes. Another salesperson discovered the body of the victim between about 2:20 and 2:40 p.m. A yard worker had arrived at the model home at about 1:25 p.m., worked in the front yard, and saw no one enter or leave the front door before the body was discovered. He could not see the rear of the house. Defendant told the police that he left the model home five or ten minutes after the witness left at which time the victim went back to her office.
The description which the witness had given to the police of the man who toured the model home with him matched another salesperson's description of a man who had been at the model homes the day previous to the day of the murder. From a registration form for that previous day which defendant had signed the police obtained an address for which they then obtained a telephone number. The police called that number and reached the defendant's brother-in-law.
The brother-in-law called the defendant and told him that the police were looking for him. He also told defendant the description of the man they were looking for based upon a television news broadcast. He told defendant that the suspect had been wearing gray shoes. The defendant, when questioned by the police, denied that he had ever owned a pair of gray shoes. But the defendant's wife, as part of an agreement with the state, testified that as she drove her husband to the police station for questioning the defendant told her to stop the car whereupon he threw his gray shoes into a dumpster. Other evidence was that the defendant had purchased a pair of gray shoes from a nearby shoe store. The defendant admitted that a pair of sunglasses found on the floor fourteen inches from the body of the victim belonged to him.
The brother-in-law testified, under a grant of immunity, that he and the defendant were burglars who specialized in burglarizing model homes and that their modus operandi was to tour a model home during the day, leave a window or door unlocked, and then return at night to take the furnishings.
A consensual search of the defendant's home produced five rounds of Winchester .38, 110 grain, semi-jacketed, hollowpoint ammunition. A bullet comparison expert from the FBI testified to his conclusion that one of the bullets from the crime scene came from the same box of ammunition as did one of the bullets found in defendant's home or that the two bullets were most likely manufactured by the same manufacturer on the same day. The defendant told the police that he owned a .38 caliber handgun and that it was in a box in his garage, but the gun was never found. There was evidence that defendant had purchased a .38 caliber handgun.
Defendant's fingerprints were found in the model home, including a thumb print on a dining room chair in the room where the victim was struck and several fingerprints on a brochure on the floor fourteen inches from the body. A bar of soap was also found next to the body, and water had been left running in the basin of the nearby bathroom where a towel was missing. When the police asked defendant about his purported fingerprints on the soap, he replied that he had picked up the soap to smell it. There was an abrasion on the victim's ring finger, apparently consistent with the ring having been forced off of that finger. The victim never removed the ring from her finger, and a past effort by her to get it off of her finger had failed.
Notwithstanding the well-presented arguments on behalf of defendant, we do not conclude that there was reversible error. First, we conclude that the evidence was not insufficient. See Heiney v. State, *274 447 So.2d 210 (Fla. 1984); Thomas v. State, 512 So.2d 1099 (Fla. 5th DCA 1987).
Second, we conclude that the admission into evidence of a video and audiotape reenactment of the actions of the state's chief witness at the model homes for the principal purpose of assisting in establishing particular time periods, especially the time when the witness last saw the defendant at the model home where the crime occurred, did not constitute reversible error. That evidence apparently served alternate functions. In the sense that it served to repeat the witness' testimony as to his time estimates, it was erroneously admitted as serving only to buttress that testimony. See McRae v. State, 383 So.2d 289, 292 (Fla. 2d DCA 1980). But in our view that did not constitute reversible error under the circumstances of this case. We have no reasonable doubt that the same verdict would have been reached without the admission of that evidence. See State v. DiGuilio, 491 So.2d 1129 (Fla. 1986). That evidence very probably did enhance the credibility of the witness. But nothing appears to have been argued to place his credibility or veracity in doubt except for defendant questioning the accuracy of the witness' testimony as to times, and the testimony in that respect was stated as being estimates. Also, the method of presentation used in the videotape does not appear to have been inflammatory or exaggerated.
In the alternative, the videotape reenactment had the apparent function of representing an experiment conducted to explain and, in a sense, fill a gap in the witness's testimony relative to the accuracy of his time estimates, and we cannot say that the reenactment was not conducted under sufficiently similar circumstances. See Young v. Illinois Central Gulf R.R., 618 F.2d 332, 337-38 (5th Cir.1980); Vitt v. Ryder Truck Rentals, Inc., 340 So.2d 962, 965 (Fla. 3d DCA 1976). The thrust of the witness's testimony as to times was that his testimony constituted estimates based upon a combination of his independent recollection and the reenactment.
No reason appears why the witness could not simply have testified as to the reenactment without the video and audiotape being shown to and heard by the jury. Yet the reenactment was conducted under police auspices with a female officer acting as the victim and a male officer acting as defendant (both in plain clothes), and we cannot say that there was an abuse of discretion in the determination that the jury should see the tape. See Vitt at 965. The jury thereby was best able to evaluate the reenactment's authenticity as a basis for the witness's time estimates and to know whether or not the witness had been unduly influenced by the police in the reenactment (which in our view was not shown to have occurred).
Our conclusion of no reversible error by reason of the admission of the video and audiotape reenactment under the circumstances of this case should by no means be taken as a general approval of the use of that type of evidence to buttress a witness's testimony.
Third, we conclude that the admission into evidence of an audiotape recording of part of a hypnosis session with that witness, that evidence being admitted on redirect examination to rebut an implied charge of improper influence on the witness, was not erroneous, see Tompkins v. State, 502 So.2d 415, 419 (Fla. 1986), especially in view of the trial court's instruction to the jury to consider the witness's testimony with caution. Also, there was testimony of the witness and of the officer who conducted the session that the witness was not hypnotized.
Fourth, we conclude that there was no reversible error in permitting the state's efforts to anticipatorily rehabilitate the testimony of defendant's wife; those efforts, in our view "did [not] impair the jury's task of determining the truth." See Bell v. State, 473 So.2d 734, 736 (Fla. 2d DCA 1985), aff'd, 491 So.2d 537 (Fla. 1986).
Finally, we conclude that the bullets found during the consensual search of defendant's home were not erroneously admitted *275 into evidence. See Norman v. State, 379 So.2d 643, 646 (Fla. 1980).
Affirmed.
SCHEB, A.C.J., and CAMPBELL, J., concur.