551 So.2d 132 (1989)
James T. JACKSON
v.
STATE of Mississippi.
No. 57904.
Supreme Court of Mississippi.
July 6, 1989.
Rehearing Denied September 20, 1989.
*134 Jim Kitchens, Constance L. Johnson, Dowdy, Kitchens, Whittington & Burkhalter, Jackson, for appellant.
Mike Moore, Atty. Gen. by DeWitt Allred, Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
*135 ROBERTSON, Justice, for the Court:

I.
Today's appellant presses a plethora of points seeking relief from a manslaughter conviction and twenty year sentence. Some of these are less than free from doubt. All have been considered with care and are discussed below. What is most troublesome of all is that nothing in the record before us makes clear, how and why appellant, a successful middle aged businessman, a pillar of his South Mississippi community, and active in his church, could kill his wife.
In the end, we are satisfied that faithful application of the law to the facts and the course of proceedings before us requires affirmance.

II.
On the night of March 12, 1985, Mary Nell Jackson was assaulted and seriously injured while on the premises of Red Carpet Motors in Columbia, Mississippi. The following day she died of the injuries sustained in the assault. Her approximately fifty-year-old husband, James T. Jackson, the defendant below and appellant here, was with her that night and much of our understanding of events prior to the arrival of police and emergency medical personnel are the result of his voluntary statements.
Red Carpet Motors is designed like the many automobile dealerships. A showroom extends across the entire front of the building. The business and sales offices are located behind the showroom. A central hallway runs from the showroom to the "shop" and "parts department" at the rear of the building. The shop doors are located on the same side of the building as the showroom doors.
According to Jackson, he and his wife arrived at the dealership at approximately 8:00 p.m. He worked on his tax return. Mary Nell telephoned a friend, Merle Bass, who testified that this call ended at approximately 8:35 p.m. At 8:56 p.m., James Jackson telephoned the Columbia Police Department and reported a robbery. Jackson requested an ambulance for his injured wife.
Within two minutes of Jackson's call, Sergeant Richard Stringer arrived at Red Carpet Motors. Jackson told him that an armed robbery had occurred and that his wife had been assaulted by someone while he, Jackson, was in another part of the building being forced at gunpoint to open the safe.
According to Jackson's statement, he and Mary Nell heard a noise at the shop door. He went through the showroom to investigate. He opened the showroom door and looked outside toward the shop door. A masked gunman confronted Jackson and forced him to open the outside shop door. Jackson and the robber walked through the shop to the central hallway. Jackson unlocked the hall door and the two went up the hall to the showroom where the safe was located. While stalling in opening the safe, Jackson says he heard a noise in the shop that sounded like boxes falling. He responded but the robber hit him and told him to hurry up and open the safe.
After opening the safe, Jackson says he gave the robber a blue bank bag containing the receipts of March 12. The robber then demanded Jackson's jewelry and money. He purportedly ripped the watch off of Jackson's wrist. The robber started up the hall. Jackson followed. The robber turned at the hallway door that opens into the shop and told Jackson not to follow him. Jackson stopped for a moment and then followed. He saw someone leaving by the shop door. Then he saw his wife lying on the floor face down, with blood running from beneath her. He immediately called 911.
Jackson gave statements detailing his version of these events on more than one occasion. He first related the sequence to Sgt. Stringer on Tuesday, March 12. He then prepared a typed statement which he delivered to the Columbia Police Department on Monday, March 18. Jackson was interviewed by the investigating officers, and on April 12 he assisted in staging a reenactment of the robbery.
*136 These various statements contain inconsistencies in the description of the robber's clothing, the duration of the robbery, and the kind of "noise" Jackson heard while opening the safe. These discrepancies aroused the suspicion of investigating officers, who, after a two month investigation failed to unearth any evidence that anyone else was at Red Carpet Motors on the evening in question, decided ultimately that Jackson had fabricated the robbery story.
This criminal prosecution formally commenced some four months later, on July 16, 1985, to be exact. On that date the Marion County Grand Jury returned an indictment charging James Jackson with the murder of his wife, Mary Nell. On his motion venue was changed to Rankin County, where he was ultimately found guilty of manslaughter. The Circuit Court, in response to the jury verdict, sentenced Jackson to serve a term of twenty years in the custody of the Mississippi Department of Corrections. Miss. Code Ann. § 97-3-25 (1972).
From that conviction and sentence Jackson now appeals, assigning ten (10) errors.

III.
Jackson first argues that the Circuit Court erred when it refused to enter judgment of acquittal notwithstanding the verdict of the jury. Jackson's specific point is that the evidence is legally insufficient to sustain a verdict of either murder or manslaughter. While conceding that the rather critical scrutiny his account of the events of the evening of March 12, 1985, received was "a legitimate inquiry," Jackson argues that the prosecution's case "was almost entirely negative in nature, and the prosecution relied heavily on persuading the jury not to believe appellant's account... ."
Our scope of review of such points is as familiar as it is limited. All of the evidence must be considered in the light most favorable to the prosecution. McCurdy v. State, 511 So.2d 148, 150 (Miss. 1987); Winston v. State, 479 So.2d 1093, 1095 (Miss. 1985); May v. State, 460 So.2d 778, 781 (Miss. 1984). The prosecution must be given the benefit of all favorable inferences that may reasonably be drawn from the credible evidence. Harris v. State, 532 So.2d 602, 603 (Miss. 1988); Burge v. State, 472 So.2d 392, 396 (Miss. 1985).
If the facts and inferences so considered point in favor of the defendant with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty, the assignment of error should be sustained. On the other hand, if there is substantial evidence in the record of such quality and weight that having in mind the beyond-a-reasonable-doubt burden-of-proof standard, reasonable fair minded men in the exercise of impartial judgment might reach different conclusions regarding the guilt of the defendant, we have no authority to disturb the jury's verdict.
Weeks v. State, 493 So.2d 1280, 1282 (Miss. 1986); Gray v. State, 487 So.2d 1304, 1310 (Miss. 1986); Parker v. State, 484 So.2d 1033, 1036 (Miss. 1986).
Jackson invokes Weathersby v. State, 165 Miss. 207, 209, 147 So. 481, 482 (1933), the general rule of which is that, if the defendant and his witnesses are the only eyewitnesses to a homicide and if their version of what happened is both reasonable and consistent with innocence and if, further, there is no contradiction of that version in the physical facts, facts of common knowledge or other credible evidence, then the accused is entitled to a directed verdict of acquittal. Weathersby, of course, is nothing more than a particularized version of our general standards according to which courts must decide whether in a criminal prosecution the accused is entitled to a judgment of acquittal as a matter of law. Lanier v. State, 533 So.2d 473, 490 (Miss. 1988); Shaw v. State, 521 So.2d 1278, 1282 (Miss. 1987); Wetz v. State, 503 So.2d 803, 809 (Miss. 1987); Harveston v. State, 493 So.2d 365, 371 (Miss. 1986).
Using these standards we examine the evidence of record in this case. Mary Nell Jackson was brutally attacked sometime between 8:35 and 8:56 p.m. When the Emergency Medical Technicians arrived at 9:01 the blood from her injuries had begun *137 to clot on the concrete floor. Although blood was spattered on the walls of the dealership, none of the victim's blood was found on Jackson or his clothes. No weapon was ever identified as the murder weapon. A shattered Coke bottle was found near the victim's body, which could have been the murder weapon. Jackson's demeanor was described as unusually calm and unconcerned by some witnesses.
Jackson's inconsistent descriptions of the assailant, and the noise during the "robbery" were presented to the jury. Quite significantly, a bank bag containing the receipts of March 12, which Jackson claimed had been stolen, was found in a file cabinet in the dealership. An employee who was also Jackson's brother-in-law, however, testified that the bank bag itself was not the same one which was in the safe prior to the robbery, although the receipts were the ones which had been in the safe. One witness, an employee who was passing by, testified that the shop door was closed at 8:45, another testified that she saw the door opening at 8:55. The evidence reflects no motive for murder.
James Jackson did not claim to know how Mary Nell Jackson was assaulted. The prosecution argued that Jackson attacked his wife, then fabricated the story to cover his crime. The evidence, as presented to the jury is full of inconsistencies, time discrepancies, and improbable physical feats by the "robber". This became apparent in the "reenactment" to be discussed below. That the bank bag with the "stolen" receipts of March 12 was found in the office may reasonably be said to suggest that Jackson was lying about the robbery.
We regard the evidence as legally sufficient to establish beyond a reasonable doubt that Jackson killed his wife. Notwithstanding, we regard Jackson's argument of such force that we should reiterate a reflection from a case decided several years ago.
Of course, this assignment of error turns not upon how we see the evidence, for our institutionally mandated and self-imposed scope of review is quite limited. That limitation is premised upon our candid recognition that the jury system is at best the least imperfect way we have of determining guilt or innocence. We cannot help but be aware that a rational, fair-minded juror could well have found [the defendant] not guilty. Nevertheless, were we to substitute our view for the jury's, one thing could be said with certainty: the chances of error in any findings we might make would be infinitely greater than is the case where those findings have been made by twelve citizens, peers of the defendant, who are on the trial scene and have smelled the smoke of the battle.
Harveston v. State, 493 So.2d 365, 372 (Miss. 1986).
The assignment of error is denied.

IV.
Jackson next argues that the Circuit Court erred when it denied his motion for a mistrial following Investigator Billy Simmons' presentation to the jury of an oral statement made by Jackson, the contents of which had not been disclosed to the defense in pre-trial discovery. The point occurred during Simmons' direct testimony. He related to the jury Jackson's "explanation" of how the bank bag may have gotten into the filing cabinet. The defense objected immediately, on grounds the prosecution had not informed the defense of its intent to use the statement.
There can no longer be doubt that Rule 4.06(a)(2),[1] Miss.Unif.Crim.R.Cir.Ct. Prac., extends to oral as well as written and recorded statements. Nixon v. State, 533 So.2d 1078, 1089 (Miss. 1987); Estes v. *138 State, 533 So.2d 437, 440 (Miss. 1988); Smith v. State, 530 So.2d 155, 158 (Miss. 1988); Moore v. State, 508 So.2d 666, 668 (Miss. 1987); Franklin v. State, 460 So.2d 104, 106 (Miss. 1984). The Circuit Court so held, and found as a fact that the statement had not been disclosed, though the defense had made repeated requests therefor. In this context, the Circuit Court sustained Jackson's objection and held the statement inadmissible. The jury was expressly admonished to disregard it. The Court even went so far as to poll each member of the jury and secure the pledge of each that the statement would be disregarded.
The Circuit Court's handling of this matter was well within its authority. Our trial system proceeds on the assumption that jurors are possessed of sufficient intelligence and integrity that, once sworn, they may be counted upon to follow instructions given by the court. See, e.g., Shoemaker v. State, 502 So.2d 1193, 1195 (Miss. 1987); Walker v. State, 473 So.2d 435, 440 (Miss. 1985). In this context, we find no error in the Circuit Court's denial of Jackson's motion for a mistrial.

V.
Jackson argues that the Circuit Court committed error when it permitted Highway Patrol Investigator Simmons, over Jackson's objection, to describe for the jury a reenactment of Jackson's version of the events of the evening of March 12, 1985.
Context is critical for understanding this assignment. Jackson  voluntarily, without question  had given several written statements describing the events of March 12 and had been interviewed extensively by Simmons. Upon studying Jackson's story, Simmons concluded that he could not quite visualize how everything was supposed to have happened. Jackson agreed to reenact the events, and this was done on April 2, 1985.
Jackson wrote the reenactment script. Simmons testified he told Jackson to take whatever time he needed, to sit down over a weekend when he had plenty of time to think, and write out a step-by-step scenario of what happened. This Jackson did. Jackson played the role of the robber, wearing a ski mask and all, and more importantly, doing what he says the robber did and controlling the timing. Jackson's, son, Jimmy, portrayed his father. The reenactment was video-taped. The prosecution concluded that the reenactment raised serious questions about the credibility of Jackson's story and proposed to present the video tape to the jury in support of its case-in-chief. Upon Jackson's objection, the Circuit Court held the video tape not admissible. The Court's grounds for this ruling were that Jackson was presented in the role of the robber and that this might have the effect of prejudicing the jury against him in the sense that he appeared in the tape in the role of a criminal. Notwithstanding, the Court allowed Investigator Simmons to describe in great detail the reenactment, subject to scrupulous guidelines which prevented the jury from knowing who had played the role of Jackson and who had played the role of the robber.
The prosecution painstakingly laid the predicate for Simmons' testimony. There can be no question but that the reenactment occurred according to Jackson's script and subject to his control of the alleged robber's actions and, as well, the timing. Simmons testified that after the reenactment Jackson expressly confirmed that the timing and events "would be very close." As such, the reenactment may fairly be categorized as an admission. It is the accused's enacted expression of just what happened.
"An admission is an acknowledgment by the accused of certain facts which tend, together with other facts, to establish his guilt." 4 Wharton's Criminal Evidence § 651 at 214 (14th ed. 1987). See also State v. Johnson, 249 La. 950, 192 So.2d 135, 142 (1966). Assuming the proper predicate has been laid, admissions of a party are admissible against that party.
Reenactment is a common law enforcement investigative procedure. E.g., State v. Ortega, 77 N.M. 7, 419 P.2d 219, 223 (1966). Where the accused is asked to *139 participate, of course, it must be preceded by proper warnings because of its inculpatory potential. Of course, the accused's participation must be free and voluntary. Commonwealth v. Hodgkins, 401 Mass. 871, 875-78, 520 N.E.2d 145, 148-49 (1988); Commonwealth v. Peters, 473 Pa. 72, 373 A.2d 1055, 1060-62 (1977).
Actually, the videotape of the reenactment may well have been admissible had it not portrayed Jackson in the role of a criminal. Commonwealth v. Hodgkins, 401 Mass. 871, 875-78, 520 N.E.2d 145, 148-49 (1988); Morgan v. State, 518 So.2d 186, 189-90 (Ala.Cr.App. 1987); Clark v. St. Thomas Hospital, 676 S.W.2d 347, 348-50 (Tenn. App. 1984). We are aware of Texas' voice of caution, e.g., Miller v. State, 741 S.W.2d 382, 388 (Tex.Cr.App. 1987), regarding the danger of unfair prejudice, but regard that minor variances in conditions and circumstances as going to weight and not admissibility. People v. Sexton, 192 Colo. 81, 555 P.2d 1151, 1154 (1976). At least one court appears to prefer verbal description of the reenactment from the witness stand, presumably because of the lessened visual impact on the jury and enhanced possibilities for cross-examination. Dowell v. State, 516 So.2d 271, 274 (Fla. App. 1987).
Because the reenactment was an admission and the predicate was laid, the Circuit Court correctly allowed Officer Billy Simmons to describe Jackson's reenactment for the jury's benefit. Rules 401, 403 and 801(d)(2), Miss.R.Ev., see also Winters v. State, 473 So.2d 452 (Miss. 1985); Neal v. State, 451 So.2d 743 (Miss. 1984).
Jackson argues that we should regard the reenactment as an experiment, not an admission. In truth, the reenactment partakes of both, an admission in the sense just described and an experiment in the sense that some of the actions Jackson attributed to the robber were difficult of performance. Our pre-Rules case law required a high degree of similarity between the conditions at the time of the event at issue and those when the experiment was conducted. Hines v. State, 339 So.2d 56, 57 (Miss. 1976); Illinois Central Gulf Railroad Co. v. Ishee, 317 So.2d 923, 926 (Miss. 1975). Simmons' testimony regarding Jackson's confirmation  itself an admission, Rule 801(d)(2)(A) & (B), Miss.R.Ev.  of the timing, schedule, and events was a sufficient predicate for the Court's receipt into evidence of Simmons' verbal description of the reenactment, even if it be regarded an experiment. To be sure, a measure of discretion resides in the trial court regarding admission of experimental evidence, Hines v. State, 339 So.2d 56, 57 (Miss. 1976), a notion necessarily importing at least two differing options neither of which if taken by the trial court will require reversal. Burkett v. Burkett, 537 So.2d 443, 446 (Miss. 1989); Hooten v. State, 492 So.2d 948, 950 (Miss. 1986) (Hawkins, J., dissenting). In today's context one viable option was overruling Jackson's objection.
The assignment of error is denied.

VI.
Jackson argues that the Circuit Court permitted investigators, J.B. Dickerson and Billy Simmons, to express from the witness stand their opinions that they believed Jackson was lying when he suggested that a robbery had occurred and that his wife had been killed by the robber's accomplice. So characterized, this lay opinion testimony constitutes error of reversible proportions, or so we are told.
We need to be clear about exactly what was said. We need further consider separately the said-to-be offensive testimony of J.B. Dickerson and then that of Billy Simmons.

A.
Dickerson first. On direct examination, the prosecution sought to elicit from Dickerson that he was suspicious about Jackson's story. Initially, Dickerson testified that "there were some discrepancies" in Jackson's story, to which the defense objected as being unresponsive to the question. Before the Court could pass on the objection, the prosecutor offered to "clarify" the question.
*140 The prosecuting attorney then asked Dickerson if, when he talked to Jackson, he had assumed that a robbery had actually taken place, whereupon the follow colloquy took place:
A. The night of the murder  the night of the alleged robbery, I did not believe it was an armed robbery.
Q. All right, did you have questions about it then?
A. I had questions, yes, sir.
Q. After you spoke with Mr. Jackson on the 18th, would you tell the jury what problems you had with  what questions came to your mind with respect to the sequence of events, the account that Mr. Jackson gave?
At this point, defense counsel objected on grounds that the question called for an inadmissible opinion. The Circuit Court impliedly sustained the objection, stating
All right. He can give the facts, but he's not to give his opinion.
As may readily be seen, however, the horse had already escaped, two-fold, before the defense objection.
Dickerson was a senior investigator for the Mississippi Highway Patrol based in Hattiesburg. He was called to the scene the night of the robbery/murder. On direct examination he testified that he was unable to identify anyone who was at Red Carpet Motors on the night of March 12 other than James T. Jackson and Mary Nell Jackson.[2] Near the end of his direct examination, Investigator Dickerson stated that he and the other officers closed their investigation on May 24th or 25th. He offered this concluding observation:
We met and discussed the interviews and leads and so forth that we had run down, and we were unable to find anyone that we interviewed or rumors or whatever that placed anybody at Red Carpet Motors.
Defense counsel immediately objected, stating that the effect of Dickerson's testimony was that the officers had "met and decided Mr. Jackson was guilty." This, according to defense counsel, was impermissible opinion testimony. The Circuit Court overruled the objection, whereupon Dickerson repeated his observation, this time:
We had just run all the leads and rumors that we had heard and could find, and we could not place anybody, in any of those rumors or whatever, that would place anybody in Red Carpet or involved in Red Carpet, the motor  the murder.
These points are controlled by the Mississippi Rules of Evidence which had been in effect for slightly over two months at the time of trial.

1.
Jackson first argues that enforcement of the Mississippi Rules of Evidence would subject him to trial under an ex post facto law in the sense that the Mississippi Rules of Evidence are more liberal in allowing admission of evidence than were our pre-Rules rules. To be sure, both federal and state constitutions protect a person from trial under an ex post facto law. U.S. Const. Art. I, § 10, cl. 1; Miss. Const. Art. 3, § 16 (1890). Some of our older cases contain the suggestion that changes in the law of evidence could be ex post facto laws. Lindsay v. State, 65 Miss. 542, 545-46, 5 So. 99, 100 (1888); and McGuire v. State, 76 Miss. 504, 512-13, 25 So. 495, 497 (1898); see also Hattiesburg Firefighter's Local 184 v. City of Hattiesburg, 263 So.2d 767, 772 (Miss. 1972). This view emanates from dicta in the venerable case of Calder v. Bull, 3 U.S. (3 Dall.) 386, 390-91, 1 L.Ed. 648, 650 (1798).
Since Calder the rule has become less formalistic. By the time of Beazell v. *141 Ohio, 269 U.S. 167, 46 S.Ct. 68, 70 L.Ed. 216 (1925), the Court regarded it well settled that
changes in the mode of trial or the rules of evidence, which do not deprive the accused of a defense and which operate only in a limited and unsubstantial manner to his disadvantage, are not prohibited.
269 U.S. at 170, 46 S.Ct. at 69, 70 L.Ed. at 218; see also Thompson v. Missouri, 171 U.S. 380, 18 S.Ct. 922, 43 L.Ed. 204 (1898); and Hopt v. Utah, 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262 (1884). Courts today routinely reject ex post facto pleas offered by persons criminally accused where the changes in the rules of evidence are of the modest sort with which we are here concerned. See, e.g., United States v. Alexander, 805 F.2d 1458, 1461-62 (11 Cir.1986); United States v. Mest, 789 F.2d 1069, 1071-73 (4th Cir.1986); and State v. Keithley, 227 Neb. 402, 418 N.W.2d 212, 215 (1988).
This Court has heard and decided under the Mississippi Rules of Evidence any number of cases arising out of events occurring before January 1, 1986, but tried after that date. To the best of our knowledge, this is the first occasion where anyone has challenged the Mississippi Rules of Evidence as ex post facto laws. We do not question the proposition that Rule 701 allows receipt of certain lay opinion testimony which, quite arguably, was excludable prior to January 1, 1986.[3] On the other hand, this is not the sort of change in law which would operate to a person's prejudice in the sense that he may have engaged in conduct in reliance upon its legality at the time. Jackson makes no suggestion that anything he did in the spring of 1985 was done in reliance upon our law of evidence as it existed at the time, nor that if he had known our law of evidence was likely to change, he would have behaved differently. Furthermore, the Rules of Evidence do not impose new standards of permissible conduct.

2.
Rule 701 provides for limited admissibility of lay opinion testimony. Such evidence
is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to the clear understanding of his testimony or the determination of a fact in issue.
In the context of a civil action arising out of a rear end collision, we have allowed an investigating law enforcement officer to give a Rule 701 lay opinion that the broken brake lights on the lead vehicle contributed to the accident. M & M Pipe & Pressure Vessel Fabricators, Inc. v. Roberts, 531 So.2d 615, 620 (Miss. 1988).
Whittington v. State, 523 So.2d 966 (Miss. 1988) is closer to the mark. There, as here, the accused was on trial in the homicide of his wife. Analogous to today's case, Whittington involved a charge that the accused had staged a fake automobile accident. Officer Chandler was permitted to express his opinion, following investigation at the scene of the accident, that he did not think Mrs. Whittington was "killed in the wreck." Whittington, 523 So.2d at 974. Whittington held the opinion there *142 expressed outside Rule 701, then held the error harmless.
It was no more than an expression that his suspicion was aroused following his investigation there at the scene. [citation omitted] Every juror already knew, of course, that the investigating officers at the scene were suspicious, or else the investigation would not have continued.
Whittington at 975. The Court then said that a "much more serious question" would have been Chandler's opinion at trial "that he did not then think she had been killed in the wreck."
Dickerson's first opinion  that on the night in question he had doubts about Jackson's robbery theory  seems controlled by Whittington. Indeed, Dickerson's prior statements "I did not believe it was an armed robbery" and "I had questions" came in without technically timely and sufficient objection.
Dickerson further testified that two months later, when the investigation was closed, that he and the other officers had been unable to locate or identify anyone else or to find that anyone besides James Jackson and Mary Nell Jackson were at the Red Carpet Motors on the night of March 12. This opinion testimony was allowed because, in the words of the Circuit Court, it explained "why the investigation ended." This opinion also reinforces the perceptiveness in the Official Comment to Rule 701 "that there is often too thin a line between fact and opinion to determine which is which."
Again, we must be specific. Dickerson did not say "In my opinion Jackson killed his wife." He did say that, after more than two months of extensive investigation, he could come up with no evidence that anyone besides Jackson and his wife were at the Red Carpet Motor premises on the night of March 12. This was a statement importing an opinion. Yet, it was rationally based upon his personal perceptions. More important, the triers of fact charged to decide Jackson's guilt or innocence, badly needed to know whether law enforcement investigators had found evidence that anyone else was present at Red Carpet Motors at the time in question. Defense counsel would certainly have been within their rights to try to extract from Dickerson that his investigation suggested the presence of a third person, had that been the case. To the extent that Dickerson's conclusory testimony cast doubt upon Jackson's theory of an armed robbery on the night in question, it certainly went to the issue of Jackson's guilt. If the testimony had not related to an issue of material fact in controversy, it would not have been relevant. See Rule 401, Miss.R.Ev.
Put in proper context, the statements at issue are a summing up of what Officer Dickerson had already stated, viz. that he and the others had carefully checked out every detail of Jackson's story and every other lead anyone had suggested before the offensive question was asked. A juror would have had to be asleep not to have realized that Dickerson was of the view that Jackson and his wife were the only people at the Red Carpet Motors shortly after 8:00 p.m. on March 12. Of course, this only renders Dickerson's opinion as unnecessary as it was harmless. In the end, we find the testimony at issue essentially a conclusory statement partaking both of fact and opinion, rationally based on Dickerson's personal perceptions and expressing the conclusion he had reached. Moreover, the opinion may not be said unhelpful to the determination of the important fact question of whether there was anyone else at the Red Carpet Motors at the time in question on March 12, 1985.

B.
The same issues appear in the direct testimony of Investigator Billy Simmons,[4] only their complexity is enhanced Simmons *143 took over the investigation from Dickerson. He witnessed the "reenactment of the robbery." Over strenuous defense objection and a continuing objection to improper opinion testimony, Simmons was allowed to tell the jury that he witnessed the reenactment, that during the reenactment the dealership was well lighted, and that the safe which was allegedly robbed was visible from the public highway which ran in front of Red Carpet Motors.
At the outset of Simmons' testimony, defense counsel had objected to the prosecution "trying to extract from this witness any opinions or conclusions as to whether certain things were physically possible or his interpretation of those things," to which the Circuit Court responded "I will sustain that objection."
The crucial testimony here is Simmons' description of what he observed during the reenactment as  according to Jackson's script  the robber was relieving Jackson of personal valuables immediately before his flight. Recall that Jackson had said the gloved robber had a gun in one hand, the bank bag in another, only then to collect rings, Jackson's billfold and watch. During the reenactment the robber (unbeknownst to the jury played by Jackson) was insufficiently dexterous to accomplish these feats. What is important is that Simmons merely told what he saw.
Specifically, during Simmons' reenactment testimony  and as he reached the point where the gunman removed Jackson's watch, the following colloquy occurred:
Q. Did Mr. Jackson indicate how the gunman removed the watch?
A. Yes, sir, Mr. Jackson had indicated that the gunman had reached up and pulled the watch from his arm.
Q. But it was impossible for him to do that?
A. They  they did not do it  were unable to do that.
Q. What happened then?
A. Mr. Jackson dropped the watch.
No defense objection was made at this time. Minutes later the direct examination of Simmons regarding the reenactment reached the point where the robber ran down the hall.
Q. At any time from the time that the  that the man  that the robber ran down the hall and turned and told Mr. Jackson to stop and the time that Mr. Jackson ran out after him, and the perpetrator cleared the shop doors, would the perpetrator have had time to do anything with the bank bag?
A. The way the reenactment went, he would  unless he just wildly threw it in the air, in the motion of running, no sir.
Q. Would there have been any time under any set of these circumstances for that man to go back in any other office and still be able to run out the shop doors and be seen when he went out the shop doors?
A. I  none that I can see.
The prosecuting attorney then asked Simmons, on the basis of his study of Jackson's statements and the reenactment he had witnessed, "Were there certain factual matters that you took into consideration in determining what course your investigation would follow, and if so, what were those factors?" Simmons answered:
I took in consideration my experience as a law officer, the time and the events that allegedly occurred here that I thought to be very unusual.
At this point defense counsel objected that the witness was giving an opinion in violation of the previous ruling. The Court instructed the witness to just "tell the facts."
Thereafter, the following colloquy occurred with Investigator Simmons:
Q. When the alleged robber and the person that was portraying Mr. Jackson arrived at the safe and attempted to do what Mr. Jackson said had happened during the robbery with respect to the taking of the bank bag and the man holding the gun and money and the rings and the watch, were they physically able  was the robber physically able in the reenactment to do that?
A. In the re-enactment he was not.

*144 Q. And Mr. Jackson maintained that's how it happened?
A. Yes, sir, that is true.
And finally:
Q. Mr. Simmons, did Mr. Jackson or Jimmy or any of them ever give you any reasonable  or ever give you any explanation about how the bank bag could have gotten back in the building?
A. No, sir, they never give me a reasonable explanation 
BY MR. KITCHENS:
Your Honor, that's an opinion, to which we would object.
BY THE COURT:
I'll sustain.
BY MR. MCDONALD: (Continuing)
Q. We would like to strike-strike the word reasonable. Did he give you any explanation about how it got in there?
A. I, of course, asked him how. I wanted a reasonable explanation as to how it might have got in, and I was looking for one. I asked them  if he had come up with any explanation at all to explain how the bank bag got back into the locked office. The only thing that he could suggest at all and did suggest to me was that possibly a particular lawman may have put it back in there.
Simmons repeatedly described the lighting conditions he observed during the reenactment. Without doubt this testimony conveys the impression Simmons regarded it highly unlikely that anyone would commit an armed robbery of a well lighted automobile dealership on a well traveled public highway at eight o'clock at night. Simmons' testimony, however, was in the form of factual statements, not opinions.
The direct examination of Officer Simmons is riddled with defense objections which were sustained by the Circuit Court. On the other hand, the answers Simmons gave concerning the lighting, inconsistencies, visibility, and placement of objects in the reenactment were fact specific. This testimony was properly qualified in that Jackson approved and controlled all phases of the reenactment. Simmons merely described for the jury what he had observed during the reenactment. Again, there can be no question but that the overall impression created by Simmons' opinion was that Simmons was of the view that Jackson had fabricated his robbery story. Even more so than is the case with Officer Dickerson, however, Simmons stayed within the rules and told only of what he had observed. The defense antidote for such testimony is cross-examination. See Miller By Miller v. Stiglett, Inc., 523 So.2d 55, 60 (Miss. 1988).
In cross-examination of Officer Simmons, the defense explored the bases of Simmons' direct testimony. Simmons was extensively questioned about all aspects of the reenactment, particularly regarding his opinion about the robber's mask and the adequacy of the lighting. He was asked if he would run from a gunman and if in his opinion it was unreasonable for Jackson not to have run. This cross-examination elicited harmful opinion testimony. It reenforced the direct testimony and focused attention on the inconsistencies in Jackson's story.
Rule 701 does not open the door to any and all opinion testimony. As we stated in Whittington, a lay witness may not express an opinion on the ultimate issue. He may not give an opinion that is not based upon his personal perceptions, nor that will not help the jury fairly resolve a controverted, material fact. Dale v. Bridges, 507 So.2d 375, 378 (Miss. 1987). During direct examination of Simmons all defense objections to opinion testimony were sustained. Defense counsel then proceeded to elicit much harmful opinion testimony on cross-examination. On re-direct, the prosecution asked Officer Simmons to list the facts, and factors, which he believed to be "... unreasonable, unlogical [sic], or incriminating." Over Jackson's objection, the Court allowed him to list these factors because the defense had "opened the door" on cross-examination to this line of questioning.
The listing of these factors on direct would have been improper. In view of the nature of the cross-examination, the Circuit Court was within its discretionary authority in allowing the disputed redirect. In no event may we sensibly conclude that this *145 redirect substantially violated Jackson's right to a fair trial. Rule 103(a), Miss.R. Ev.; Ponthieux v. State, 532 So.2d 1239, 1248 (Miss. 1988).
The assignment of error is denied.

VII.
Jackson argues that the Circuit Court erred when it admitted into evidence State's Exhibit S-42, a blue bank bag with the allegedly stolen checks and cash. His point is predicated on the testimony of Eddie Westbrook, a Red Carpet Motors employee, that the bank bag introduced was not the same one kept in the company safe. The evidence was undisputed, however, that the contents of the bag, the checks and cash, were the same as those Jackson had previously reported stolen.
Rule 401, Miss.R.Ev., provides:
"Relevant Evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.
The bank bag and its contents were relevant within Rule 401 in the sense that they had a great impact upon the credibility of Jackson's story that he had been robbed on the evening of March 12. As such, the evidence was admissible. See Rule 402, Miss.R.Ev.
Jackson argues nevertheless that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice or confusion of the issues. No doubt, our law vests in the circuit court the authority to exclude otherwise admissible evidence where these factors obtain. Rule 403, Miss.R.Ev.; Edlin v. State, 533 So.2d 403, 407 (Miss. 1988); May v. State, 524 So.2d 957, 965 (Miss. 1988); Jenkins v. State, 507 So.2d 89, 91-93 (Miss. 1987). Jackson concentrates on Westbrook's testimony that the bag was not the right bag. Compare Stringer v. State, 491 So.2d 837, 839 (Miss. 1986). To be sure, this may be said to raise questions. On the other hand, the evidence of the contents of the bag were highly relevant to the prosecution's theory of the case. Had the fact that the bag may have been a different bag not been presented to the jury, Jackson may well have had an even greater complaint in the sense that the jury might surely have inferred that it was the same bag in which the day's receipts were kept. In any event, it strikes us as quite apparent that the probative value of Exhibit S-42 substantially outweighs any legally cognizable prejudice flowing therefrom. The Circuit Court was well within its authority in overruling the defense objection to this evidence.
The assignment of error is denied.

VIII.

A.
Jackson argues that the Circuit Court erred when, at the request of the prosecution and over his objection, it instructed the jury that it could return a verdict on the lesser-included offense of manslaughter.[5] The variety of manslaughter instructions sought and given was so-called heat of passion manslaughter, Miss. Code Ann. § 97-3-35 (Miss. 1972).
*146 Jackson makes two arguments in support of his view, one pragmatic and the other legalistic. First, Jackson argues that "the granting of the instruction could easily have encouraged a compromise verdict in a weak case," and goes on to articulate the thesis that this is precisely what happened. Second, Jackson makes a mutuality argument. He points to the fact that in a murder case our law allows the prosecution to obtain a manslaughter instruction, almost willynilly, but that the defendant is not always so entitled, pointing to a number of our cases wherein we have upheld a Circuit Court's refusal to grant the defendant's request for a manslaughter instruction. See Reed v. State, 526 So.2d 538, 540 (Miss. 1988); Fairchild v. State, 459 So.2d 793, 800-02 (Miss. 1984). Candor requires concession that Jackson has accurately described the current state of our law. See Mease v. State, 539 So.2d 1324, 1338 (Miss. 1989) (Hawkins, P.J., specially concurring).
We have recognized in a number of cases and in a wide variety of contexts that, where there is in the record evidence legally sufficient to support a jury finding of guilty of murder, had the jury so found, the defendant will not be heard to complain that a manslaughter instruction was given. Crawford v. State, 515 So.2d 936, 938 (Miss. 1987); Hubbard v. State, 437 So.2d 430, 438-39 (Miss. 1983); Harris v. State, 413 So.2d 1016, 1019 (Miss. 1982); Cole v. State, 405 So.2d 910, 913 (Miss. 1981); Huston v. State, 105 Miss. 413, 419, 62 So. 421, 422 (1913). This has been held so even though the manslaughter instruction was not warranted under the evidence. Cook v. State, 467 So.2d 203, 209 (Miss. 1985); Grace v. State, 379 So.2d 540, 542 (Miss. 1980); see also Mease v. State, 539 So.2d at 1338 (Hawkins, P.J., specially concurring).
We need not resolve the point today, for we find within the record an adequate evidentiary basis for the manslaughter instruction. Recall that, in deciding whether there is sufficient evidence that an issue be submitted to the jury, we must consider all of the evidence in the light most favorable to the party requesting the instruction, in this instance, the prosecution. That party must also be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. If the facts and inferences so considered point in favor of the opposing party with sufficient force that reasonable men could not have found beyond a reasonable doubt for the requesting party on the issue, then the granting of the lesser-included offense instruction is error. Whitehurst v. State, 540 So.2d 1319, 1326-27 (Miss. 1989); Monroe v. State, 515 So.2d 860, 863 (Miss. 1987); Harper v. State, 478 So.2d 1017, 1021 (Miss. 1985). Where the evidence is not so one sided, however, the court ordinarily should grant the lesser offense instruction. Griffin v. State, 533 So.2d 444, 447-48 (Miss. 1988); Ruffin v. State, 444 So.2d 839, 840 (Miss. 1984); Knowles v. State, 410 So.2d 380, 382 (Miss. 1982).
The evidence in the present record reflects that Jackson and his wife were a happily married couple with no outward evidence of marital discord. Jackson had been a law abiding citizen, a pillar of the community. The physical facts were that Mary Nell Jackson was bludgeoned to death by repeated blows to her head with a blunt instrument, that a broken Coca Cola bottle was found at the scene, and that her wounds were consistent with the theory that the coke bottle delivered these blows. The evidence recounted above could also lead a reasonable hypothetical juror to believe that no one was present at the Red Carpet Motor premises between 8:30 and 9:00 p.m. on the evening of March 12, other than Jackson and his wife. From these facts, it may fairly be said that the jury's reasonable conclusion was that some sudden and unexpected provocation  admittedly unexplained  enraged Jackson causing him to take leave of his senses for a few moments to grab a nearby object  a coke bottle  and in the heat of passion strike his wife repeatedly. That we are without evidence of exactly what may have provoked Jackson may not on these facts serve to exclude this hypothesis as one that a reasonable juror may have found beyond a reasonable doubt to have occurred. The process of reasoning known as exclusion *147 may convince the rational mind as well as positive proof of inclusion.
Jackson's point is without merit.

B.
Jackson further objected to Instruction No. S-6 on the grounds it was an abstract statement of law which offered the jury no guidance in applying that theory to the facts.
At the prosecution's request, the Circuit Court granted and submitted to the jury Instruction No. S-1, defining the elements of murder, the principal charge laid in the indictment.[6] When Instruction No. S-1 is read in conjunction with the two definitional instructions, S-6 and S-12, we may only conclude that the jury had proper guidance in the application of S-6 and S-12 to the facts of the case. We have held that giving an abstract instruction is not reversible error unless the jury is misled, Kitchens v. State, 300 So.2d 922, 925 (Miss. 1974), and if there is no substantial basis for an inference of prejudice when the instructions are read together as a whole, there is no reversible error, Mosley v. State, 396 So.2d 1015, 1018 (Miss. 1981). See also Whittington v. State, 523 So.2d 966, 978 (Miss. 1988); Ruffin v. State, 447 So.2d 113, 119 (Miss. 1984); Pickett v. State, 443 So.2d 796, 800 (Miss. 1983).
The assignment of error is denied.

IX.
Jackson next argues that the Circuit Court erred when it permitted the jurors to return to their hotel rooms and collect their belongings before retiring to deliberate upon their verdict.
The Circuit Court instructed the jury at the close of the evidence that some time would be required for the giving of the jury instructions and presentation of closing arguments. The Court determined to let the jury break and pack up their "stuff" before resuming. Jackson does not contend that the Circuit Court intended to "rush" the jury. He argues that the Court's comment sent an unintended signal to the jury that they were not expected to be sequestered for another night and that this increased the probability of a compromise verdict  manslaughter.
The record reflects no contemporaneous objection to the Circuit Court's "pack up your stuff" suggestion. To obtain review of such remarks, the point ordinarily must be called to the court's attention when made, and corrections thereof requested, or proper objection made, at that time unless the court's conduct, on the entire record, was so reprehensible and prejudicial as to deny fair trial or due process. Jackson Yellow Cab Co. v. Alexander, 246 Miss. 268, 148 So.2d 674 (1963). There is no showing that the Circuit Court so abused its discretion in the premises, nor does any contemporaneous objection appear in the record.
The assignment of error is denied.

X.
Jackson argues that the Circuit Court erred in denying his motion for a new trial in that the verdict of the jury was against the overwhelming weight of the evidence. Here Jackson's point is addressed to the weight of the evidence, not its legal sufficiency.
*148 A motion for a new trial is addressed to the sound discretion of the Circuit Court which may grant a new trial if it deems such required in the interest of justice or if the verdict is contrary to law or the weight of the evidence. Rule 5.16, Miss.Unif.Crim.R.Cir.Ct.Prac. (1979). Wetz v. State, 503 So.2d 803, 812 (Miss. 1987); Van Buren v. State, 498 So.2d 1224, 1228-29 (Miss. 1986). The Circuit Court should not order a new trial unless it is convinced that the verdict is so contrary to the weight of the evidence that to allow it to stand would be to sanction an unconscionable injustice. Temple v. State, 498 So.2d 379, 382 (Miss. 1986); Weeks v. State, 493 So.2d 1280, 1283 (Miss. 1986).
In reviewing this claim, this Court  as was the case with the court below  must accept as true the evidence which supports the verdict. Van Buren, 498 So.2d at 1228; Malone v. State, 486 So.2d 360, 366 (Miss. 1986). This Court will reverse only when it is convinced that the circuit court has abused its discretion in the premises. Wesley v. State, 521 So.2d 1283, 1286 (Miss. 1988); Shive v. State, 507 So.2d at 900-01; Van Buren v. State, 498 So.2d at 1228-29.
Having in mind the evidence presented to the jury as summarized hereinabove, we cannot say that the Circuit Court abused its discretion in denying Jackson's motion for a new trial. Pinson v. State, 518 So.2d 1220, 1224 (Miss. 1988); Holliday v. State, 455 So.2d 750, 752 (Miss. 1984); Goldman v. State, 406 So.2d 816, 817-20 (Miss. 1981); Brown v. State, 394 So.2d 316, 319 (Miss. 1981); Brown v. State, 293 So.2d 425, 428-29 (Miss. 1974).
The assignment of error is denied.

XI.
Jackson finally argues that the Circuit Court erred when it considered the unproven charges relating to a possible motive for the offense when imposing sentence. As indicated above, the Court sentenced Jackson to twenty years imprisonment, the statutorily-provided maximum penalty for the crime of manslaughter. Miss. Code Ann. § 97-3-25 (1972). The District Attorney and the Sheriff of Marion County recommended that Jackson be given the maximum sentence. The Chief of Police of Columbia, Mississippi, also urged a maximum sentence.
The record reflects at the sentencing hearing the following comments by the Circuit Court:
The other thing was that during the course of the pre-sentence report there were some statements presented to me concerning another matter that's before me, another defendant, and that person has supposedly made some statements that they had some romantic ties with you. The  after that statement came out and was made available, I understand there was a meeting where you had with this person, that was observed and documented, and that that meeting did in fact take place, and there was an exchange of what appeared to be money at that meeting. I think you may be aware of that  been made aware of it anyway, and I would let you refute it if you so desire, but I think you have been made aware of that situation.
At this point defense counsel strenuously objected to the accuracy of this information and the Court's considering it in passing sentence. The Court responded: "I'm just telling you I have looked at that" whereupon the following occurred:
BY MR. KITCHENS:
Yes, sir. I have, too, Your Honor. I have interviewed the person in question, who also denied it.
BY THE COURT:
Right, but they  the statement was made at one time by that person  made twice by that person.
BY MR. KITCHENS:
The person denied making the statement, your Honor, to me. I have a taped interview with the individual in which that was very strongly denied.
BY THE COURT:
The information that I have been supplied is just the opposite, on two different occasions from credible people, but I don't give that the weight or anything.
*149 I'm just mentioning that as a factor that  that there  lead to two possible events as to what happened back in the shop or any reason for it. The jury has resolved that issue at any rate. The jury that heard the matter, I think, was very attentive and I think very conscientious, and I think they are very competent. I think they had a lot of evidence to consider and weigh, and I think the  several of the issues that they weighed against you was the darkness, it wasn't as dark as it may have appeared at one time. The fact about the watch; I think the fact about the time problems, about the noise, seeing-hearing the noise and then trying to go do something about it when someone had a gun on you, the fact that you ran after the person who had the gun, and finally and probably the most damaging part of it, without taking all of it in, was the bank bag being found in there, and the only way that your version could be correct, even if you corrected all these other matters, would be for someone else to have put that bank bag there. I think the jury feels like that you did not put it there, and based upon that, going by the jurys' [sic] version, in which I concur in, there seems to be an elaborate effort on your part  you lead two different lives, you have no remorse for what you did or you're afraid of something else or someone, and for that reason, and as far as the sentencing goes, even though you do have a fine record, and a lot of good references there, I'm going to sentence you to twenty years in the custody of the Mississippi Department of Corrections, and that will be the sentence of the Court in this matter.
Our law has long provided that the imposition of sentence following a criminal conviction is a matter within the discretion of the Circuit Court, subject only to statutory and constitutional limitations. So long as these are not offended, we rarely interfere. Moreover, the Court is not limited to the consideration of evidence presented of record at trial when imposing sentence. On this record we find no legal error or abuse of discretion in the circuit court's imposition of a sentence of twenty years' imprisonment.
The assignment of error is denied.
CONVICTION OF MANSLAUGHTER AND SENTENCE OF TWENTY (20) YEARS IMPRISONMENT AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and PRATHER, ANDERSON and BLASS, JJ., concur.
DAN M. LEE, P.J., dissents by separate written opinion.
SULLIVAN and PITTMAN, JJ., not participating.
DAN M. LEE, Presiding Justice, dissenting:
I would reverse the lower court and remand for a new trial on the grounds that improper opinion testimony was admitted, which deprived James T. Jackson of a fair trial.
In Section VI, the majority concludes that the testimony of investigators J.B. Dickerson and Billy Simmons was admissible lay opinion under Rule 701. With all due respect to the majority, they are mistaken.
The majority cites M & M Pipe & Pressure Vessel Fabricators, Inc. v. Roberts, 531 So.2d 615, 620 (Miss. 1988) and Whittington v. State, 523 So.2d 966 (Miss. 1988) as authority for the introduction of these officers' lay opinion testimony.
M & M Pipe was a civil case in which we stated, "(i)t does not take an expert to know that if brake lights are not functioning, an accident may occur." 531 So.2d at 620. The dispute over whether the evidence in M & M Pipe was admissible dealt with the application of M.R.C.P Rule 26(b)(4)(A)(i). The proponents of the testimony had violated the discovery rule which requires that the identity of expert witnesses and the substance of the testimony be provided before trial. In holding that the trial court did not abuse its discretion in allowing the testimony despite the discovery violation, this Court characterized the opinion testimony as lay opinion under Rule 701 M.R.E. The issue in M & M Pipe *150 was whether the opinion testimony was expert or lay opinion. The issue in the case sub judice is whether the testimony is admissible under Rule 701. It avails us nothing that we know this is lay opinion.
As the majority states, Whittington is closer to the mark. The opinion expressed in Whittington by Officer Chandler was whether or not the victim was "killed in the wreck." This Court, in Whittington, found that the opinion expressed by Officer Chandler was inadmissible under Rules 701 and 704, but went on to characterize the trial court's error in admitting the evidence as harmless. As stated in the dissent there, "(a)llowing a shifting of the jury's responsibility cannot be deemed harmless error." 523 So.2d at 982. The testimony in Whittington did not meet the two-pronged test of Rule 701, and neither does the opinion testimony in this case. What the majority does here is reinforce and extend Whittington to such an extent that a defendant can now find that he is tried, not by a jury of his peers, but by the police charged with investigating the crime.
There are two components to Rule 701. Part (a) requires that the opinion be based on first-hand knowledge. Officer Simmons specifically stated that his opinion testimony was based upon Mr. Jackson's statement and the re-enactment discussed in Part V of the majority opinion. This is knowledge sufficient to meet the requirements of expert opinion under Rule 702, but not the lay opinion requirement of first-hand knowledge. In United States v. Carlock, 806 F.2d 535 (5th Cir.1986), the Court ruled that opinion testimony was impermissible under F.R.E. 701 absent a showing that the opinion was based on personal knowledge sufficient to make the opinion more than an educated guess. In that case the witness worked in the defendant's office. She saw an invoice for heavy equipment and "put two and two together" with other information, the nature of which she could not recall at trial, in surmising that defendant was the owner of the equipment. The Fifth Circuit pointed out that F.R.E. 701 does not open the door to any and all opinions, but only conclusions drawn from observations in circumstances where it is impractical to recount factual components of the opinion. In distinguishing between expert and lay opinion the Fifth Circuit stated:
Because these (lay) opinions draw upon the facts in the case itself, they are more easily confronted than are expert opinion, whose source is often extraneous to the case at trial. As such receipt of lay opinion is much less likely to be prejudicial, especially where its role is cumulative and is not essential to the sufficiency of the evidence, as here.
806 F.2d at 552.
In this case, the listing of factors which led the investigating officers to focus the murder investigation on James Jackson goes beyond the realm of factual components. As in Carlock, the officers relied on extraneous matters, particularly "leads" which the investigators "had run down." These extraneous matters were not available for examination by the jury at trial; there was no opportunity for the defense to meet and counter the effect of this material on the opinions formed by the police officers. In United States v. Dotson, 799 F.2d 189 (5th Cir.1986), it was held reversible error to allow government agents to offer opinions on the truthfulness of the defendant and his witnesses where those opinions were based solely on the agent's conduct of a criminal investigation about the defendant.
Part (b) of Rule 701 requires that the lay opinion testimony be helpful in resolving issues. The Advisory Committee warns that "(i)f ... attempts are made to introduce meaningless assertions which amount to little more than choosing up sides, exclusion for lack of helpfulness is called for by the Rule." Advisory Committee's Note, F.R.E. 701(b). The listing by police officers of factors which lead them to suspect the defendant is nothing more than a "choosing up sides." There is a distinct possibility that the jury was influenced by what appears to be an "official" opinion of the police department that the defendant is guilty. See West v. State, 249 So.2d 650 (Miss. 1971). The majority acknowledges that this case is troublesome and the facts *151 are at best unclear. The danger of allowing this type of opinion testimony, particularly by police officers, is apparent in this case where the jury decision could very well have been decisively influenced by the opinion of these witnesses. In other words, but for the opinions expressed by these police officers, Jackson may very well have been found not guilty. This makes a mockery of the concept of trial by a jury of one's peers.
The majority says in Part VI,2, A that the opinion testimony of Dickerson was "as unnecessary as it was harmless." I agree the testimony was unnecessary, rendering it inadmissible under Rule 701(b). I disagree that it was harmless; and would reverse and remand for a new trial excluding the inadmissible lay opinion testimony of Officers Dickerson and Simmons.
NOTES
[1] Rule 4.06(a)(2) reads as follows:

The prosecution shall disclose to each defendant or to his attorney ... upon request and without further order ... [a] copy of any recorded statement of the defendant to any law enforcement officer; ... .
An accused's oral statement recalled by a law enforcement officer has within the meaning of the rule been "recorded" within the officer's memory.
[2] Investigator Dickerson initially stated, without objection,

We did interview a number of people. We didn't find in any of the interviews or the investigation that we could determine anybody else was at Red Carpet Motors on the night of the 12th other than James T. Jackson, and Mrs. Mary Nell Jackson.
The fact that Jackson's counsel made no objection at this point, of course, does not operate as a waiver to a subsequent objection when similar testimony is offered. See Rhone v. State, 254 So.2d 750, 753 (Miss. 1971); Hawkins v. State, 193 Miss. 586, 593, 10 So.2d 678, 679 (1942).
[3] Even so, Rule 701 hardly works a radical departure in our law of evidence. Lay opinion testimony has been regarded admissible in a myriad of contexts, although we have pretended such were but exceptions to the general rule. Consider, for example, our pre-Rules cases recognizing the admissibility of lay or non-expert opinion testimony to establish a criminal defendant's sanity or insanity, e.g., Porter v. State, 492 So.2d 970, 973 (Miss. 1986); Johnson v. State, 475 So.2d 1136, 1146 (Miss. 1985); Groseclose v. State, 440 So.2d 297, 301 (Miss. 1983); the competency of a testator to make a will, e.g., Smith v. Estate of Harrison, 498 So.2d 1231, 1233 (Miss. 1986); In Re Estate of Prine, 208 So.2d 187, 190 (Miss. 1968); or deed, e.g., Hendricks v. James, 421 So.2d 1031, 1042 (Miss. 1982); the speed of an automobile, e.g., Howard v. State, 346 So.2d 918, 920 (Miss. 1977); Ming v. City of Jackson, 202 Miss. 260, 2657-68, 31 So.2d 900, 901-02 (1947), or the intoxication of its driver, e.g., Howard v. State, 346 So.2d 918, 920 (Miss. 1977); that a sample of lime was the same as that a party had previously purchased, Warren v. Allgood, 344 So.2d 151, 152 (Miss. 1977); to establish the value of real property, e.g., Mississippi State Highway Commission v. Franklin County Timber Co., Inc., 488 So.2d 782, 786 (Miss. 1986); Pearl River Valley Water Supply District v. Wood, 252 Miss. 580, 598, 172 So.2d 196, 204 (1965), or of a vessel, e.g., Thomas v. Global Boat Builders & Repairmen, 482 So.2d 1112, 1116 (Miss. 1986).
[4] Simmons testified without objection that his investigation had failed to turn up any "employee, former or past, nor anyone else" besides Jackson and his wife who were at Red Carpet Motors between 8:00 and 9:00 p.m. on March 12. Later, on direct examination, Simmons was asked if he had been made aware "of any physical evidence at the scene or anywhere else that would exclude Mr. Jackson as a suspect" and, again without defense objection, Simmons answered, "No, sir, I was not. Did not."
[5] The two instructions at issue are Instructions Nos. S-6 and S-12. Instruction S-6 reads:

The court instructs the jury that the killing of a human being, without malice, in the heat of passion, by the use of a dangerous weapon without authority of law and not in necessary self-defense, either real or apparent, is manslaughter. Instruction S-12 reads:
The court instructs the jury that if you find from the evidence in this case, beyond a reasonable doubt, to a moral certainty and to the exclusion of every other reasonable hypothesis consistent with innocence that the defendant is guilty of murder, then the form of your verdict should be as follows:
"We, the jury, find the defendant guilty of murder."
or if you should find beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis consistent with innocence that the defendant is guilty of manslaughter, then the form of the verdict should be as follows:
"We, the jury, find the defendant guilty of manslaughter."
Or, if you find the defendant not guilty of either, then the form of your verdict should be as follows:
"We, the jury, find the defendant not guilty."
[6] Instruction No. S-1 reads:

The court instructs the jury that the defendant, James Jackson, has been charged with the crime of "murder", and therefore, if you find from the evidence in this case, beyond a reasonable doubt, to a moral certainty and to the exclusion of every other reasonable hypothesis consistent with innocence that the defendant, James Jackson, on or about the 12th day of March, A.D., 1985, in Marion County, Mississippi, did wilfully, unlawfully, feloniously, without authority of law and of his malice aforethought commit an assault upon one Mary Nell Jackson, a human being, and which said assault subsequently caused the death of the said Mary Nell Jackson on the 13th day of March, A.D., 1985, and if you believe from the evidence in this case, beyond a reasonable doubt, to a moral certainty and to the exclusion of every other reasonable hypothesis consistent with innocence he did wilfully, unlawfully, feloniously, without authority of law, and of his malice aforethought kill and murder the said Mary Nell Jackson, a human being, then you shall find the defendant, James Jackson, guilty of murder.