# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-KA-01827-COA

**DAVID WAYNE LOMAS A/K/A DAVID LOMAS**          **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**          **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 10/31/2019 |
| TRIAL JUDGE: | HON. CELESTE EMBREY WILSON |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JOHN M. COLETTE |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: SCOTT STUART |
| DISTRICT ATTORNEY: | ANGELA HUCK |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 03/13/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE CARLTON, P.J., McDONALD AND GREENLEE, J.J.

### McDONALD, J., FOR THE COURT:

¶1. On July 24, 2019, a Desoto County Circuit Court jury convicted David Lomas of sexual battery in violation of Mississippi Code Annotated section 97-3-95 (Rev. 2014) and of fondling his eleven-year-old grand-niece in violation of Mississippi Code Section 97-5-23 (Rev. 2014). The circuit court sentenced him thirty years' imprisonment for the battery conviction and fifteen years' imprisonment for the fondling conviction, to be served concurrently in the custody of the Mississippi Department of Corrections. After the circuit court denied Lomas's post-trial motions, Lomas appealed. He raises issues of alleged error, including prosecutorial misconduct, the circuit court's admission and exclusion of testimony,

the circuit court's denial of his post-trial motion, ineffective assistance of counsel, and cumulative error. Having considered the arguments of counsel and the record, we affirm Lomas's convictions and sentences.

**Facts**

¶2. In July 2016, Lomas, who lived outside of Hattiesburg, started to work with his nephew at a construction job in Hernando near where his nephew lived.[1] For the first few days, Lomas stayed with his nephew and his family, sleeping on the couch. Lomas then decided to go home, purchase an RV camper, and took it back to an RV park in Southaven. Lomas bought the camper, but because his spot at the RV park was not ready, Lomas moved it to his nephew's yard. At that time, Lomas's nephew was married and living with his wife and his two children. His father[2] and his father's girlfriend lived in a mother-in-law suite on the second floor of the house.

¶3. Lomas arrived at his nephew's home with his camper late on a Saturday night. On Sunday morning, July 10, 2016, the youngest child was not feeling well, and Lomas's nephew decided they would not go to church. The older child, eleven-year-old "Mary,"[3] asked and was given permission to go to see her uncle and tell him good morning.

¶4. Lomas gave his grand-niece some cantaloupe to eat and then took her into the bedroom. There, according to Mary, he lay her on the bed, licked her private parts, and

---

[1] The nephew contacted Lomas, a welder, because the nephew needed a welder for a job he had successfully bid for at the University of Memphis that involved welding.

[2] Lomas's brother, "Pops," was in business with his son, Lomas's nephew.

[3] "Mary" is an alias used for the name of the minor victim to protect her privacy.

"French-kissed" her. He stopped when Mary's younger sister knocked on the camper door. Lomas told Mary not to tell anyone what happened, and he went into the bathroom to change his shorts.

¶5.     Mary went into the house, crying and upset, and told her parents that Lomas had raped her. She told her mother that Lomas had licked her vagina. The medical record of Mary's physical examination later that day recounts:

> 11 yr. old female stated that her Uncle David french-kissed her and put his tongue in her privates. He told her she was beautiful and that he loved her. Mother reported that [Mary] had gone to his camper behind the family's home, and he told her to go to the back where it was cool. Her 7 yr. old sister walked in, and he stopped, and [Mary] said she had to go to the bathroom and left. Also touched her breasts. She immediately went into the house and told her mother she had been raped. Uncle is David Lomas, age 53, and he had come to Desoto Cty to work with [Mary]'s father.[4]

¶6.     Mary's parents called law enforcement. Among those who responded was Detective Suzanne Wallace of the DeSoto County Sheriff's Department. Mary's mother told her what Mary had said. Wallace collected the underwear, shorts, and shirt that Mary was wearing at the time of the incident. Other deputies placed Lomas in a police car. Wallace determined she needed a bucchal swab from Lomas, but he did not agree. Wallace explained that she would need to detain him only so she could obtain a search warrant for the bucchal swab.[5] Lomas was taken to the station, and after obtaining the search warrant and bucchal swab, Wallace told Lomas he was free to go.

---

[4] The medical record also notes that Mary's medications included Ambilify, Clonidine, Prozac, and Buspar.

[5] Lomas's nephew ordered him off his property, and Lomas planned to return to Hattiesburg. Wallace wanted to get the bucchal swab before Lomas left.

¶7. Lomas's nephew also told Detective Wallace about a prior incident that occurred approximately two years earlier. At that time, Mary's grandfather, "Pops," was staying with them. One day Lomas's nephew observed "Pops" come in from work, and nine-year-old Mary hugged him. "Pops" kissed her on the forehead, and they talked about their day. Mary's father saw and heard all of this. After "Pops" went upstairs, Mary told her dad that "Pops" had "French-kissed" her. Her father immediately asked if anything further had happened, and when Mary explained that she was referring to the kiss on her forehead, he corrected her and said, "That was not a French-kiss."[6] This prior incident is meaningful because after the more current incident in July 2016, Lomas called "Pops." Lomas told "Pops" that he had "French-kissed" Mary because Lomas had heard that "Pops" had done so in the past.[7]

¶8. Wallace accompanied Mary and her parents to the Rape Crisis Center in Memphis, where Mary underwent a physical examination. No injuries were found, yet pursuant to protocol, staff completed a rape kit for subsequent testing.[8] In addition to collecting evidence at the scene and accompanying Mary and her parents to Mary's physical examination,

---

[6] Mary's dad testified that Mary was not crying or upset when she and he discussed the incident —two years later, when Mary reported this incident, she was visibly shaken and upset.

[7] Both the State and Lomas felt this prior incident was relevant. The State felt this testimony showed show that Lomas admitted to "French-kissing" the child. Lomas felt it showed that the child had previously accused a relative of wrongdoing that turned out to be false.

[8] On cross-examination, Wallace admitted that in transporting the rape kit materials back to the station, the box it was in fell out of her vehicle, and the seal was partially torn.

4

Wallace arranged for Mary to undergo a forensic interview at the Healing Hearts Child Advocacy Center in Southaven. The next day, Mary appeared, and forensic examiner Tina Roberson interviewed her. The interview was videotaped. Roberson said Mary gave age-appropriate responses and clear answers as to what her uncle had done. Roberson determined that the child's descriptions were consistent with those of a child who had been sexually abused.

¶9. DNA testing was performed on Mary's underwear, which was visibly stained. Tests showed that although there was some difference in the coloration of the stain, there was no seminal fluid. Utilizing the bucchal swab taken from Lomas, further DNA testing showed that neither Lomas nor his parental line could be excluded as contributor to the male DNA material found in Mary's underwear.

¶10. On October 13, 2016, a grand jury indicted Lomas on two counts: sexual battery in violation of Mississippi Code Annotated section 97-3-95 and fondling in violation of Mississippi Code Annotated section 97-5-23. Lomas filed several pre-trial motions, including a motion to exclude hearsay, a motion to preclude DNA evidence, and a motion to exclude his own prior statements. The circuit court held several hearings on these matters and ultimately denied these motions. The case was tried from July 22, 2019, to July 24, 2019.

¶11. Before empaneling a jury, the circuit court conducted an in camera competency hearing at the defense's request to determine if Mary was competent to testify. The circuit court reported to the parties what it covered with Mary and why it held that Mary was

competent. Thereafter, the circuit court held a tender-years hearing with the parties present. Her parents testified, as well as Roberson concerning Mary's forensic interview, and the circuit court found that Mary's statements to them were admissible.

¶12. Witnesses for the State included Mary's parents, Mary, Wallace, Mary's grandfather "Pops," and experts Roberson, Leah Dygert, Steven Little, and Leslia Davis. Mary's father testified that Lomas, his uncle, was like a father-figure to him because his own father, who was divorced from his mother, was in the military and gone a lot. He also testified that he and his wife had adopted Mary when she was three. Prior to that time, Mary had lived with her biological parents in a very difficult situation. Her mother was arrested when Mary was just a baby; her father tried to raise her, but Mary was found by the police wandering the streets at age two. She was put in foster care, and Lomas's nephew and his wife ultimately adopted her a year later. Mary's father testified that the effects of Mary's early life had taken a toll on her and that she began therapy when they first adopted her. She was diagnosed with Reactive Attachment Disorder, which is a self-protective reflex stemming from a lack of care during her first twenty-four months of life that caused Mary to have a negative reaction toward anyone who subsequently tried to care for her. Mary's father testified that Mary was still in therapy at Journey for New Beginnings Counseling Center eight years later when the subject incident happened, which set her back considerably. He said she could not accept how slow the justice system was working and she started becoming aggressive and eventually violent. She spent one year in a children's home. Ultimately, her parents decided it might help Mary to live with her biological mother, who had been released from prison for several

years and was doing well. So at the time of the trial, Mary was living with her biological mother and doing better, though she was also still in therapy and taking medication.

¶13. Mary's father was asked about Mary's March 10, 2015 psychological evaluation. At that time, he and his wife had to review a form and check off concerns they had which included:

> [Mary] exhibiting intense displays of anger, self-destructive behavior; being manipulative; victimizes others; is argumentative, bossy, needs to control everything, and lacks impulse control. She exhibits persistent, nonsense questions, perceives herself as a victim, has presumptive entitlement issues and [is] indiscriminately affectionate with strangers. [Mary] lies about obvious things, has marked mood changes, inappropriate emotional responses, has sleep disturbances and has hidden food.

This evaluation was performed before the incident in question. Mary's father clarified that all this behavior was similar to the conduct of his other children, i.e., normal childish lies and stubborn behavior. He pointed out that Mary only reacted angrily toward him and his wife due to the Reactive Detachment Disorder because she feared that those who cared for her would leave her. So rather than being hurt, she lashed out before the other shoe dropped. He said she did not act this way toward teachers or peers.

¶14. Mary's mother confirmed her husband's testimony about Mary's RAR diagnosis, treatment, and behavior. She said Mary would never tell outlandish lies. She also testified that Mary had not been exposed to any sexual behavior or material, so she had no idea how Mary could have learned the word "rape." Mary's mom said they had not had "the talk" but that she had told her girls that if anyone touched their private parts, they should report it immediately. Mary's mom said that after this incident, Mary became homicidal and suicidal,

7

and she had to stay at The Villages, a youth home, for about one year. After that stay, Mary still had issues, and Mary's mom contacted Mary's biological mother, who was working and stable. Mary went to stay with her and fared better.

¶15.   Mary testified that on the morning of July 10, 2016, she went to visit her uncle in his camper that was parked behind their house. He offered her some cantaloupe, and they sat on the couch, eating. Lomas hugged her and said he loved her. She said this was nothing inappropriate. When they finished, Lomas picked her up and took her into the bedroom and laid her on the bed. He pulled her shorts and underpants down and started licking her privates. She felt his tongue inside her. He then pulled her head down and French-kissed her, which she described as kissing with the tongues touching each other. Mary said she was in the RV for about ten or fifteen minutes when her younger sister knocked on the door. Lomas got up and went into the bathroom to change his shorts. He told her not to say anything because he did not want to get in trouble. He told her to fix herself up, i.e., pull up her shorts and underwear. He let Mary's younger sister in, and Mary said she needed to use the restroom and left the RV. She ran and told her parents that she had been raped. She did not know the meaning of the word, but she knew Lomas had done something bad to her.[9] Mary admitted that she would get mad at her mother at times for things like being told to do the dishes when she did not want to. She said that she had pulled a knife on her mother, once before and once after the incident. Because of these incidents, she went to the children's home. She is now living with her biological mother and doing well.

_____

[9] A few days later her parents told her that "rape" means someone putting their private parts inside you, but there is something else called "sexual assault."

8

¶16.    Wallace testified about her investigation, which has already been recounted above. "Pops" then testified.  He said that he was Mary's grandfather and Lomas's brother.  The State asked "Pops" about business dealings with Lomas, which included their establishing a joint line of credit for a business venture.  Then "Pops" testified about the phone conversation he had with Lomas in which Lomas said:  "I never would have French kissed [Mary] if [Mary's father] hadn't told me you had done it already."  Lomas initially objected to this testimony, but then he withdrew his objection.  "Pops" said he told Lomas on the phone that he had not done such a thing to Mary.  "Pop" then explained to the jury the prior incident with Mary when she was nine.  He said he had come from work to Mary's house where he was living in their mother-in-law suite.  The girls met and hugged him, and he kissed Mary on her head.  Mary asked her father if "Pops" had French-kissed her and her father replied that "Pops" had not.

¶17.    On cross-examination by Lomas's attorney, "Pops" testified that initially the business he and Lomas started was profitable but that the business relationship "went sideways" when Lomas took $40,000 from their line of credit.  But this was after the incident with Mary.  "Pops" also admitted that ten or fifteen years ago, he found out that his mother was behind three months in her rent when she should have had plenty of money from her alimony and retirement.  Lomas was supposed to have been taking care of making her payments, and "Pops" learned that Lomas had taken his mother's money.  When confronted, Lomas taunted him, saying "What's Little Jimmy going to do to protect his little Mommy?"  So "Pops" asked to borrow his son's gun that "Pops" planned to take to a family meeting about the

9

matter. They had the family meeting, but "Pops" testified that he did not get or bring a gun. The matter was resolved at the meeting, and the brothers hugged and reconciled.

¶18.   Next to testify was Leah Dygert, a therapist from Journeys to New Beginnings counseling center. Although Mary had been counseled at the center for a number of years, Dygert just became her counselor in July 2016. She testified that Mary had undergone comprehensive evaluations when she was six and when she was ten. Dygert reviewed the evaluations and highlighted their contents for the jury. She explained Mary's background and development since she was a toddler, including the symptoms that led to a diagnosis of Reactive Attachment Disorder (RAR). Mary was still experiencing RAR symptoms in her second evaluation, though she had progressed some. Dygert opined that any experience that would cause Mary to distrust an adult, including a sexual assault, would set her back. She said, "You would expect to see some behavioral changes after such an event." These reports also include assessments of Mary's behavior by her parents and prior counselor, including "self-destructive behavior, being manipulative, victimizes others . . . perceives herself as the victim, has entitlement issues." The records also show that Mary had been prescribed medication of for attention deficit disorder, for which Dygert said many children take Abilify (for mood stability) and Buspar (for anxiety).

¶19.   The State called forensic interviewer Tina Roberson formerly employed by Healing Hearts Child Advocacy Center to testify. She interviewed Mary the day after the incident using the professional protocol, which she explained to the jury, including non-suggestive or leading questions to the child. Roberson said Mary gave age-appropriate answers and that

in her opinion, Mary's disclosures were consistent with those of a child who had been sexually abused. The jury also watched the tape of the interview that was admitted into evidence. Roberson also said that her job was not to determine if the child was telling the truth, but she said that statistically only four percent of forensic-interview disclosures are false.

¶20. Steven Little of the Mississippi Forensic Laboratory testified next. Little was accepted as a forensic scientist specializing in serology (the science of determining the presence or absence of bodily fluids—blood, semen, skin cells, and saliva). After serology testing, items may also undergo DNA testing later by someone else. Little tested the items sent to him in this case, including the rape kit and Mary's panties, shirt, and shorts. He prepared a report that was entered into evidence, which showed an absence of sperm cells in Mary's clothing or in her vaginal or oral swabs. He preserved samples of the panties for further testing.

¶21. Little's testimony was followed by the DNA tester, Leslia Davis, who also worked for the Mississippi Forensics Laboratory. She had Mary's saliva swab, Lomas's bucchal swab, and the sample of Mary's panties, both inside and outside the crotch area. She did an initial DNA autosomal-comparison test, which yielded results for Mary only, indicating that Mary herself could not be excluded as a contributor. Davis's initial testing did reveal a male chromosome present as well, but she could not get a full chromosomal profile of that male. Davis then performed a test called YSTR to determine a profile for that male chromosome. From Lomas's DNA, Davis determined that Lomas could be a contributor because his Y

11

(male) chromosome profile matched. But Davis also pointed out that any male in Lomas's lineage (fathers, brothers, or uncles) could also have been contributors because they all possess the same Y-chromosome profile. Davis had no DNA from other Lomas male family members to test. She also said that there is the possibility that DNA can be secondarily transferred, for example, if someone sits in a chair that someone else has been sitting in for a long time.

¶22.    The State rested, and Lomas moved for a directed verdict, which the circuit court denied. In his defense, Lomas called one witness, another Lomas brother Frank. Frank testified that there were five Lomas brothers altogether. He said that David Lomas, the defendant, initiated a plan to move their mother out of a dilapidated house into a better one around 2000. The brothers agreed that each would pay a portion of the mortgage, but "Pops" "dropped out." Frank said there was never any animosity between "Pops" and David over the mortgage payments. But Frank considered himself the peacemaker between "Pops" and David. He testified that "Pops" often misunderstood things.

¶23.    The defense rested, and Lomas renewed his motion for a directed verdict, which the circuit court denied.

¶24.    After being instructed and hearing closing arguments, the jury began its deliberation at 2:24 p.m. They later sent a note saying that they were unable to reach a verdict on Count I (sexual battery). The judge called the jury back into the courtroom and, with the agreement of both parties, gave them a *Sharplin*[10] instruction:

---

[10] In *Sharplin*, the Mississippi Supreme Court approved the following instruction to a jury in a similar situation:

I'm going to give y'all one more instruction, and y'all have worked hard. I know that it is possible for honest men and women to have different opinions about the facts of the case, but if it is possible to reconcile your differences of the opinion and decide this case, then you should do this. Accordingly, I remind you that the Court originally instructed you that the verdict of the jury must represent the considered judgment of each juror. It is your duty as jurors to consult with one another in view of reaching an agreement if you can do so without violence to your individual judgment. Each of you must decide the case for yourself but only after an impartial consideration of the evidence with your fellow jurors.

In the course of your deliberations, do not hesitate to examine your own views and change your opinions if you are convinced it is erroneous, but do not surrender your honest convictions as to the weight or affect of the evidence solely because of the opinions of your fellow jurors or for the mere purpose of returning a verdict. Please continue your deliberations.

Soon thereafter at 5:43 p.m., the jury returned a verdict of guilty on both counts.

¶25.    After the trial, Lomas retained new counsel. On October 31, 2019, the circuit court heard argument on Lomas's motion for judgment notwithstanding the verdict or, in the alternative, a new trial. The circuit court denied the motion and convened Lomas's sentencing hearing, during which Mary's father testified about how this incident has affected their entire family. The State also argued that defendants similarly convicted had received sentences of thirty years for a sexual battery conviction and ten years for a fondling conviction. Lomas called Deborah Darby, who testified that she had known Lomas for forty years and that he is lovable and honorable. She has two granddaughters that she has left alone with Lomas who has never acted inappropriately with them. Lomas also called Hillaire

---

"I know that it is possible for honest men and women to have honest different opinions about the facts of a case, but, if it is possible to reconcile your differences of opinion and decide this case, then you should do so."

*Sharplin v. State*, 330 So. 2d 591, 596 (Miss. 1976).

13

Long who knew Lomas through the Mississippi State Junior Chamber Association ("JC's") with whom Lomas has been affiliated for over forty years. She said he has volunteered to work on numerous events involving children, such as the annual Christmas parade and working with small groups of children. She also said that Lomas has never acted inappropriately. Lomas's last witness was Blake Baucom, who testified that he has known Lomas for twenty-seven years since Lomas gave Baucom his first job. Baucom has five children, including a thirteen-year-old girl. Baurcom said that Lomas has interacted with their family hundreds of times, and Beaucom would not have a problem leaving any of his children alone with Lomas. At the close of the defense's testimony, Lomas's attorney argued that Lomas was fifty-six with no criminal record and has maintained long, healthy relationships. After hearing the testimony and arguments, the circuit court sentenced Lomas to serve thirty years imprisonment followed by ten years of supervision (five years reporting and five years non-reporting) for the sexual battery conviction. For the fondling conviction, the circuit court sentenced Lomas to serve fifteen years imprisonment to run concurrently with the sexual battery sentence.

¶26. Lomas appealed and raises the following issues on appeal: (1) denial of due process due to prosecutorial misconduct; (2) error by the circuit court in allowing the testimony of "Pops" concerning Lomas's stealing from their mother; (3) error by the circuit court in excluding portions of Frank Lomas's testimony; (4) error by the circuit court in denying Lomas's motion for judgment notwithstanding the verdict or a new trial regarding the fondling conviction and sentence; (5) ineffective assistance of trial counsel; and (6)

14

cumulative error.

## Discussion

### I. Whether Lomas was denied due process because of prosecutorial misconduct.

¶27. Lomas argues that he was denied a fair trial because of the State's allegedly improper and prejudicial closing argument. "The standard of review which appellate courts must apply to lawyer misconduct during opening statements or closing arguments is 'whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created.'" *White v. State*, 228 So. 3d 893, 904 (¶28) (Miss. Ct. App. 2017) (quoting *Wilson v. State*, 194 So. 3d 855, 864 (¶30) (Miss. 2016)). But if a defendant fails to make a contemporaneous objection to a prosecutor's closing, the issue is waived on appeal. *Evans v. State*, 226 So. 3d 1, 31 (¶78) (Miss. 2017); *Walker v. State*, 913 So. 2d 198, 238 (¶148) (Miss. 2005). In situations where a failure to object has occurred, "we will review such a claim if the prosecutor's statement was so inflammatory that the trial judge should have objected on his own motion." *Evans*, at 31 (¶78) (quoting *O'Connor v. State*, 120 So. 3d 390, 399 (¶23) (Miss. 2013)). The application of the "so inflammatory" standard is in accord with the Court's concern that "the failure to contemporaneously object would never operate as a waiver." *Johnson v. State*, No. 2017-KA-01483-COA, 2020 WL 1430497, at *11 (¶36) (Miss. Ct. App. Mar. 24, 2020), *cert. denied*, 302 So. 3d 648 (Miss. 2020) (quoting *O'Connor*, 120 So. 3d at 401 (¶29)).

¶28. In this case, Lomas failed to object to any portion of the State's closing argument. Therefore, we must determine whether the alleged prosecutorial misconduct was so

15

inflammatory that the trial judge should have intervened. Yet the trial court's sua sponte interference with closing argument is limited:

> The prosecutor is granted wide latitude during closing argument. "The court cannot control the substance and phraseology of counsel's argument; there is nothing to authorize the court to interfere until there is either abuse, unjustified denunciation, or a statement of fact not shown in evidence."

*Grayson v. State*, 118 So. 3d 118,139 (¶60) (Miss. 2013) (quoting *Manning v. State*, 735 So. 2d 323, 345 (Miss. 1999)). Applying these principles, we address Lomas's allegations of prosecutorial misconduct.

### *A. DNA Comments*

¶29. Lomas contends that the prosecution's statements to the jury that the "DNA matches him [Lomas]," "the DNA cinches up the case," and, "Lomas did it because his DNA is in the crotch" were so inflammatory that the circuit court should have intervened. Lomas says this because the evidence showed only that Lomas could not be excluded as a contributor.

¶30. However, the record shows that during its closing argument, the State also reviewed the direct evidence of the incident: testimony from the child, which was consistent with her video interview that the jury saw, and testimony from Mary's parents and interviewer Roberson. The State argued the DNA testing results were evidence corroborating Mary's testimony. Before making the comments that Lomas now calls inflammatory, the State accurately reviewed for the jury the expert's testimony concerning the DNA, saying:

> There wasn't enough of a sample, Leslia Davis testified, to get a match of just this Defendant. But then you go to step two because there was male DNA in there. So she tested further. The best test you can do. We can't get any better than this; that he cannot be excluded and his paternal lineage cannot be excluded, and that's the DNA we have.

16

The State further argued who among that lineage were present at the location: Mary's father, who was clearly with his wife at the time of the alleged incident; Mary's grandfather "Pops," who was upstairs with his girlfriend and did not come down until after the police left; and Lomas. The State said:

> This window of opportunity was only 15 minutes where this happened, and it was in the camper. She never accused anybody else. She never said Pop hurt her. She never said [her father] hurt her. We can eliminate them as suspects. They are the only two other people that were in the vicinity when this happened. By process of elimination, David Lomas is the only suspect, and he did it.

¶31. We have held that "so long as counsel in his address to the jury keeps fairly within the evidence and the issues involved, wide latitude of discussion is allowed." *Coleman v. State*, 289 So. 3d 1221, 1224 (¶8) (Miss. Ct. App. 2020). Moreover, "[t]he prosecutor may comment upon any facts introduced into evidence, and he may draw whatever deductions and inferences that seem proper to him from the facts." *Galloway v. State*, 122 So. 3d 614, 643 (¶72) (Miss. 2013). In this case, we do not find that the comments made by the prosecution were improper or inflammatory. They were made in the context of the evidence and merely constitute the State's deductions from it.

### B. Facts Not in Evidence

¶32. Lomas contends that the State also committed prosecutorial misconduct when it improperly argued facts not in evidence, referring to Mary's answers to leading questions. Lomas claims such answers are not established facts and thus, to argue them is improper.[11]

---

[11] "Arguing statements of fact which are not in evidence or necessarily inferable from facts in evidence is error when those statements are prejudicial." *Jackson v. State*, 174 So. 3d 232, 237 (¶12) (Miss. 2015).

17

Lomas also contends that the State incorrectly argued that after the alleged sexual battery, Lomas changed his "underwear" when Mary actually testified that he changed his "shorts." Again, Lomas did not raise a contemporaneous objection to either of these points during the State's closing argument, and therefore, Lomas's challenge to them is procedurally barred unless the argument was so inflammatory as to deprive Lomas of a fair trial.

¶33.    Specifically, during its close the State said: "[Lomas] told her not to tell anybody. Then he proceeds to go to the bathroom, and she remembers him changing his underwear." Lomas argues that Mary herself did not testify that Lomas told her not to tell anyone, but rather Mary answered "Yes" to a leading question, and that Mary used the word "shorts" not "underwear."  The State's questioning of Mary went as follows:

Q.    Do you recall anything else that happened?  After he sexually assaulted you, do you remember anything else after that; what he did?

A.    He just said, I don't want to get into trouble.

Q.    Did he leave the room? Did he stay in the room?

A.    He left the room because he -- he ran in the bathroom. The bathroom is, like, not that big, and he, like, bent down, and he took his shorts off; and he was, like, changing his shorts. . . .

Q.    So that happened after?

A.    Yes, ma'am.

Q.    And you said that he told you not to tell anybody because he could get in trouble?

A.    Yes, ma'am.

¶34.    Facts are established through the presentation of documentary or testimonial evidence.

Witnesses testify to facts by answering the questions posed to them. "A leading question is one that suggests to the witness the specific answer desired by the examining attorney." *Magee v. State*, 124 So. 3d 71, 77 (¶18) (Miss. Ct. App. 2012) (internal quotation omitted). When the question is leading, the witness is agreeing to the facts contained in the question. If a party disagrees with that fact, or the form of the question, the party must object. If not, the fact, even if obtained through a leading question, is established. Moreover, in cases when a child is testifying, leading questions are allowed. *Nunnery v. State*, 126 So. 3d 105, 110 (¶22) (Miss. Ct. App. 2013). In this case, Mary's response to the State's question established that Lomas told her not to tell anyone, and the prosecution properly argued that fact to the jury.

¶35. Mary also testified that Lomas went into his bathroom, bent down, and changed his shorts. Neither the State nor the defendant asked any further questions to clarify what the word "shorts" meant. It could mean outerwear, like gym shorts, or it could also mean underwear, as in "boxer shorts." Given the vagueness of the term, the State could properly argue the logical inference that Lomas was changing his underwear. Again, Lomas did not object, and he had an opportunity to clarify Mary's testimony with her during the trial or to correct the State in his closing argument. Apparently, Lomas's trial counsel did not find it "so inflammatory" to object; nor do we find it "so inflammatory" to reverse the jury's verdict.

### C. Inappropriate Arguments

¶36. Lomas argues that the State improperly made a "send a message" argument when it said, "Give the family some justice; give [Mary] some justice." We disagree.

¶37. "A 'send the message' argument is one that encourages juries to use their verdict to send-a-message to the public or to other potential criminals, instead of rendering a verdict based solely on the evidence introduced at the trial of that case." *Coleman*, 289 So. 3d at 1225 (¶11). In its closing, among other things, the prosecution in *Coleman* said: "We had one person that was the victim of a violent crime. We're hoping that she can get some justice today. . . ," *id*. at 224 (¶7), similar to the argument the prosecution made here. In *Coleman*, we found that this was not a "send a message" argument. *Id*. at 1225 (¶12). Similarly, the prosecution's statement made concerning justice for Mary in this case was not a "send a message" argument. The record shows that the State thoroughly argued the evidence against Lomas and urged the jury to find him guilty on that evidence. The State did not argue that justice for Mary was necessary to deter such future crimes in the community, but rather it argued the evidence and logical inferences that could be made from it.

¶38. The cases cited by Lomas provide examples of prohibited send-a-message arguments, but what the State said in those cases is clearly different from this case. In *Wells v. State*, 98 So. 2d 497, 513 (Miss. 1997), the State argued, "A death penalty sentence in this case will send a strong and clear message to other child abusers in this county and in this state that we protect our children, and we are not going to stand for one instant . . . ." In *Williams v. State*, 522 So. 2d 201, 208 (Miss. 1988), the prosecution argued, "By your vote, you can make the statement clearly, steadfastly, and unequivocally that law or order exists for everyone in Harrison County." In *Payton v. State*, 785 So. 2d 267, 270 (¶9) (Miss. 1999), the State argued: "Send a message to these older, more mature, criminals, 'We are not going to let you

20

ruin young people's lives like you have ruined these three people's lives, and all these lives you endangered in the process.'" These prosecutorial statements are clearly "send a message" arguments and different from the State's asking the jury to give Mary and the family some justice.

¶39. Having dealt with all three instances that Lomas raises as "inappropriate comments" made by the State during closing arguments, we find no prosecutorial misconduct.

> **II. Whether the circuit court erroneously allowed opinion evidence and testimony of an uncharged crime.**

¶40. Lomas's next argument concerns testimony from "Pops" that Lomas contends contained impermissible opinion evidence and evidence of an uncharged crime. Specifically, "Pops" testified Lomas told him that he had French-kissed Mary.[12] The State then asked "Pops" what his opinion was of what Lomas had told him. Lomas did not object to this question. "Pops" replied that "it was an admission." Later, "Pops" testified that Lomas was stealing from their Alzheimer-stricken mother and that Lomas stole $40,000 from the joint line of credit that he and Lomas had secured for their business. Lomas failed to object to this testimony and actually cross-examined "Pops" on these topics. Still Lomas claims the circuit court erred in admitting this evidence. We disagree.

¶41. Even though the standard of review of the admission or exclusion of evidence is abuse of discretion, *Saddler v. State*, 297 So. 3d 234, 241 (¶21) (Miss. 2020), "[t]he failure to object to testimony at trial waives any assignment of error on appeal." *Manning v. State*, 269

---

[12] Lomas initially objected to what he told "Pops" on hearsay grounds, but he later withdrew that objection.

So. 3d 216, 220 (¶15) (Miss. Ct. App. 2018). Here, Lomas failed to object to the evidence he now wishes to challenge and is procedurally barred from doing so.

¶42. Notwithstanding the procedural bar, Rule 701 of the Mississippi Rules of Evidence limits when lay opinions are admissible:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a) rationally based on the witness's perception;
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

"Pops'"opinion that what Lomas told him was an admission that does not fall within any of the M.R.E Rule 701 exceptions. Further, "a lay witness may not express an opinion on the ultimate issue," *Jackson v. State*, 551 So. 2d 132, 144 (¶10) (Miss. 1989), which in this case would be Lomas's guilt of the charges against him. Accordingly, the circuit court would have correctly sustained any objection to the question that elicited this improper lay opinion testimony.

¶43. However, even had Lomas objected and the circuit court erroneously allowed the testimony, we would not reverse on that basis. "[R]eversal will be appropriate only when an abuse of discretion resulting in prejudice occurs." *Saddler*, 297 So. 3d at 241 (¶21). In determining prejudice to the defendant, "[t]he question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Id*. at 242 (¶26). Here Lomas was not prejudiced by "Pops'" opinion. "Pops" testified Lomas said that he would not have French-kissed Mary if Mary's father had not told Lomas that

"Pops" had done so before. It seems logical and elementary that anyone hearing this would conclude from that statement that Lomas had admitted to French-kissing Mary. It was Lomas's words that contributed to his conviction, not "Pops'" opinion of them. This testimony is different from that in the case of *Woods v. State*, 973 So. 2d 1022 (Miss. Ct. App. 2008), that Lomas cites. In *Woods*, several lay witnesses were asked if the victim of statutory rape was telling the truth. *Id*. at 1025 (¶4). Woods objected to the State's attempt to elicit opinions on the truthfulness of the victim and the circuit court agreed, prohibiting the witness from answering. *Id*. at 1026 (¶10). We said that the circuit court acted properly in sustaining Woods' objection. *Id.* In this case, "Pops" was not asked an opinion on the truthfulness of another witness's testimony. Accordingly, we find no basis to consider reversal for the improper lay opinion testimony that the jury heard.

¶44. The testimony concerning Lomas's alleged theft of $40,000 from a joint line of credit and Lomas's financial management of his mother's money was also unchallenged and was brought out, in large part, as the result of Lomas's own questions. On direct examination, the State merely established that "Pops" and Lomas had established a joint line of credit. Lomas did not object to the relevance of the testimony. On cross-examination, Lomas himself brought out the theft of the $40,000:

> Q.  Y'all borrowed some money together before the allegation that bring us here today; is that correct?
>
> A.  Yes, sir.
>
> Q.  And that went sideways; isn't that right?
>
> A.  Yes, it did.

23

Q.    What's your statement on what happened? In regards to the loan? In regard to the loan and why y'all got out of whack.

A.    Well, we got a line of credit for the company, Lomas Renovation and Repair; and through the bank, that money was supposed to be used for materials and labor. And then as we get paid, we'd pay it off so it was going to be and ebb and flow of how much we borrowed and paid back; and we pretty much did that. That's pretty much how it went until the incident occurred, and then unknowingly, he went and cleared out the account to the tune of about -and I'm guessing of about $40,000.

It was not the State, but Lomas himself who brought out Lomas's alleged theft from the joint line of credit.

¶45.    On direct examination, the State asked "Pops" no questions about Lomas's treatment of his mother. But on cross-examination, Lomas asked "Pops" whether "Pops" had ever asked his son to borrow a gun to intimidate Lomas. "Pops" answered that he had. On re-direct examination, the State followed up, in appropriate re-direct, on why "Pops" had sought to intimidate Lomas. "Pops" then testified to events surrounding their mother that had occurred fifteen years before. He said she told him that she was about to be evicted because she was behind in rent. "Pops" researched the accounts and found that Lomas was taking money from their mother's accounts for personal items. This led to a family meeting to discuss the issue, and "Pops" had asked his son about borrowing a gun to take to the meeting, which he never did.

¶46.    The record shows that in addition to failing to object to this testimony except for one objection to hearsay, Lomas brought this testimony upon himself. A similar instance occurred in *Jackson v. State*, 551 So. 2d 132 (Miss. 1989), where law enforcement testified that they were suspicious of Jackson's claim that his wife had been killed during a robbery

24

because, among other things, of the inconsistencies in Jackson's reenactment of events that night. *Id*. at 139, 144. On cross-examination of the testifying officer Jackson brought out even more harmful opinions, as the supreme court pointed out:

> [Officer] Simmons was extensively questioned about all aspects of the reenactment, particularly regarding his opinion about the robber's mask and the adequacy of the lighting. He was asked if he would run from a gunman and if in his opinion it was unreasonable for Jackson not to have run. This cross-examination elicited harmful opinion testimony. It reenforced the direct testimony and focused attention on the inconsistencies in Jackson's story.

*Id*. at 144. On re-direct, the prosecution asked Officer Simmons to list the facts, and factors, which he believed to be ". . . unreasonable, unlogical [sic], or incriminating." *Id*. Over Jackson's objection, the Court allowed him to list these factors because the defense had "opened the door" on cross-examination to this line of questioning. *Id*. When the circuit court overruled the defense's objections, the Mississippi Supreme Court found no error, saying:

> In view of the nature of the cross-examination, the Circuit Court was within its discretionary authority in allowing the disputed redirect. In no event may we sensibly conclude that this redirect substantially violated Jackson's right to a fair trial.

*Id*. at 144-45.

¶47. Similarly, in this case, even if Lomas were not procedurally barred from arguing the issue of "Pops'" testimony about the alleged theft of the line of credit funds or those of their mother, we would find no error because Lomas "opened the door" to the damaging testimony and brought most of it out himself. Accordingly, we find no merit to Lomas's claim that the circuit court allowed improper opinion testimony or testimony of an uncharged crime.

25

### III. Whether the circuit court properly excluded portions of Frank Lomas's testimony.

¶48. Lomas next argues that the circuit court abused its discretion and committed reversible error in sustaining the State's objections during the testimony of the Lomas's only witness, his brother Frank. We disagree.

¶49. As noted earlier, the admissibility of evidence is reviewed under an abuse of discretion standard. *Saddler v. State*, 297 So. 3d 234, 241 (¶21) (Miss. 2020). "As long as the trial court remains within the confines of the Mississippi Rules of Evidence, its decision to admit or exclude evidence will be accorded a high degree of deference." *Magee v. State*, 300 So. 3d 1088, 1090 (¶9) (Miss. Ct. App. 2020). "Reversal is appropriate only when the circuit court's abuse of discretion results in prejudice to the accused." *Williams v. State*, No. 2019-KA-00967-COA, 2020 WL 7350419, at *2 (¶8) (Miss. Ct. App. Dec. 15, 2020).

¶50. Lomas raises three instances where he claims the circuit court improperly sustained the State's objections to Frank's testimony: (1) when Frank was asked if "Pops" contributed any money for their mother's care; (2) when Frank was asked about a three-way phone call which included him, "Pops," and Lomas; (3) when Frank was asked a question about Lomas's allegedly stealing money from their mother. We review each separately.

#### A. Contribution to Their Mother's Care

¶51. Lomas's first contention is that he was prevented from eliciting the extent of "Pops'" contribution to the care of their mother. After discussing the mother's move to a new home, Frank testified that initially, he, Lomas and "Pops" were going to make the house payments, but that "[Pops"] dropped out" and another brother picked up on paying his share. After this,

26

Frank was asked, "At that point did he contribute anything to helping take care of your mother?" The State objected on the grounds of relevance. The attorneys argued the objection, and the judge said, "I don't know that it's relevant. I'll give you a little latitude, but get to the point." The circuit court did not sustain the objection as Lomas incorrectly contends. After the judge's comment, Lomas did not re-ask the question or direct Frank to answer it. Whatever information Lomas may have wanted to elicit with the question was not barred by the court, but by Lomas's failure to pursue it. Accordingly we find no error for improper exclusion of testimony by the court on Lomas's first complaint.

### B. Three-way Phone Call

¶52. The testimony about a three-way phone call among "Pops," Lomas, and Frank to which the State objected concerned the problems with Lomas's withdrawal of funds from the line of credit. It was not the phone call in which Lomas admitted to French-kissing Mary as Lomas mistakenly argues. The questioning of Frank that Lomas claims was improper went as follows:

> Q. What was your impression from those phone calls as it relates to this case?
>
> A. As it relates to this case, there was a phone call, again, pertaining to this common line of credit that the two of them, plus my nephew, was on; trying to get interest payments until the situation could be completely resolved. But at some point, in my recollection, is David [Lomas] made some light-hearted remark that, you know, "If I had known you had"--
>
> BY MS. HUCK: Objection, Your Honor. It's hearsay.
>
> BY THE COURT: Response?
>
> BY MR. SMITH: Your Honor, it's his present sense impression of a

27

phone call between the three of them.

BY THE COURT:   Sustained.

Lomas then rephrased the question to ask Frank about his impression of the phone call, to which there was no objection.  However, Frank did not answer the question, but went on to testify about a text from "Pops."  Again, if there was some relevant information that Lomas did not secure, it was not because of the State's  objection and the court's ruling, but rather because Lomas's witness did not provide it when later asked.  Accordingly we find no error for improper exclusion of testimony by the court.

### C.        "Pops'" Misunderstanding of Things

¶53.    Lomas's final instance of improper exclusion of evidence concerns Frank's testimony about "Pops'" misunderstanding things.  Frank said he had experienced this on one occasion. When Lomas asked what that occasion was, the State objected on the basis of relevancy.  The circuit court said he would give Lomas a little leeway, and Frank answered:

> A.      When my mom was in her home being cared for by a private party that I had hired,  there was an incident where my -- I went over, and my mom was basically in her own feces.  And so I had a conversation with the person, Marty, to be sure that that was not going to happen again. One time incident.  Spoke to my brothers about it because I tried to speak to them about everything.  ["Pops"] understood that to be an ongoing thing, my impression.

The State objected again on relevance to which the defense responded that the testimony went to "Pops'" truthfulness.  The circuit court sustained the objection but did not instruct the jury to disregard what Frank had said.  Accordingly, the jury heard it and Lomas was not prejudiced.

28

¶54. In sum, the alleged exclusions of Frank's testimony were in fact either not exclusions at all or were due to the lack of follow-up questioning by Lomas. Accordingly, we find no merit to this issue.

### IV. Whether the circuit court erred in denying Lomas's motion for a JNOV or a new trial for fondling.

¶55. Lomas contends that there was no proof of gratification of lust, an essential element of the crime of fondling. Therefore, Lomas argued, the circuit court erred in denying his motion for directed verdict and motion for judgment notwithstanding the verdict or a new trial on that count.

¶56. "A directed verdict and a motion for JNOV both challenge the sufficiency of the evidence presented to the jury. Therefore, our standard of review is the same for both." *Goldsmith v. State*, 195 So. 3d 207, 212 (¶16) (Miss. Ct. App. 2016) (internal citations omitted). The question is whether the evidence shows that the defendant committed the act and that each element of the crime was proven. *Guss v. State*, 296 So. 3d 734, 737 (¶10) (Miss. Ct. App. 2020). "In considering the sufficiency of the evidence, we are required to accept as true all credible evidence consistent with guilt and give the State the benefit of all favorable inferences that may reasonably be drawn from the evidence." *Id.* We are to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Ringer v. State*, 203 So. 3d 794, 796 (¶3) (Miss. Ct. App. 2016).

¶57. "Unlike a motion for a directed verdict or JNOV, a motion for a new trial challenges the weight of the evidence." *Goldsmith*, 195 So. 3d at 212 (¶17) (Miss. Ct. App. 2016). We

review for abuse of discretion and will not grant a new trial "unless the verdict is so contrary to the overwhelming weight of the evidence that, to allow it to stand, would be to sanction an unconscionable injustice." *Id.*

¶58. The crime of fondling is found at Mississippi Code Annotated section 97-5-23 (Rev. 2014):

> (1) Any person above the age of eighteen (18) years, who, for the purpose of gratifying his or her lust, or indulging his or her depraved licentious sexual desires, shall handle, touch or rub with hands or any part of his or her body or any member thereof, or with any object, any child under the age of sixteen (16) years, with or without the child's consent, or a mentally defective, mentally incapacitated or physically helpless person as defined in Section 97-3-97, shall be guilty of a felony . . .

In this case, the "touching" and "handling" was Lomas's French-kissing Mary. The jury instruction on Count 2-fondling included all the elements the jury needed to find:

> In Count 2, Defendant DAVID WAYNE LOMAS, is charged with the crime of handling, touching and/or rubbing a child for lustful purposes, commonly called Fondling.
>
> If you find from the evidence in this case, beyond a reasonable doubt, that:
>
> > 1.) On or about July, 10, 2016, in DeSoto County, Mississippi, David Wayne Lomas, a person above the age of eighteen (18) years; and
> >
> > 2.) [Mary] was a child under the age of sixteen (16) years; and
> >
> > 3.) David Wayne Lomas did handle, touch and/or rub any part of the body of [Mary] with his hands or any part of his body; to wit by kissing her, and
> >
> > 4.) DAVID WAYNE LOMAS's purpose in handling, touching and/or rubbing was to gratify his lust or indulge his depraved, licentious sexual desires,

30

then you shall find the Defendant guilty of Fondling in Count 2.

If the State has failed to prove any one or more of these elements beyond a reasonable doubt, then you shall find the Defendant not guilty of Fondling.

The issue before us is whether the record contained proof of the element of Lomas's intent and whether the weight of the evidence supports the jury's finding Lomas guilty.

¶59.   On the fondling count, the State presented the following proof:  Mary's medical records of that day that include a contemporaneous statement of the occurrence, including the French-kissing;  Mary's in-court testimony that Lomas had French-kissed her which satisfied the element of touching;  testimony that Mary knew the difference from an innocent kiss and a French-kiss from a prior incident;  "Pops'" testimony that Lomas admitted that he had French-kissed the child;  and  Mary's testimony that Lomas then went into the bathroom and changed his shorts.  "[T]he jury can infer a defendant's lustful intent from the circumstances of the touching."  *Shead v. State*, 294 So. 3d 655, 664 (¶31) (Miss. Ct. App. 2020);  *Williams v. State*, 240 So. 3d 436, 442 (¶13) (Miss. Ct. App. 2017).  In this case, there was testimony that Lomas took the eleven-year-old child into his bedroom, and while they were alone, he licked Mary's private parts and then French-kissed her.  When the younger sister knocked on the camper, Lomas told Mary not to tell anyone or he would get in trouble.  He then had to go to the bathroom to change his "shorts" before letting the younger child in.  DNA with a male Y-chromosome profile that could include Lomas was found in Mary's panties.  From these circumstances, a reasonable juror could have inferred that the assault and fondling had occurred and that Lomas did it with lustful intent.  Assuming the jury did so infer, as we said in *Shead*, we too agree that there is no other reason

31

why Lomas would perform these actions, except for the purpose of gratifying his lust. *Shead*, 294 So. 3d at 663 (¶26).

¶60.    Taking all inferences in favor of the verdict, we cannot say that no reasonable trier of fact could have found lustful intent.  Nor can we say that the jury's verdict, including a finding of lustful intent, was so contrary to the evidence that to let it stand would cause unconscionable injustice.  Accordingly, we find this issue lacks merit.

### V.    Whether Lomas was provided ineffective assistance of trial counsel.

¶61.    Lomas contends that because his trial counsel's performance was constitutionally deficient, his conviction should be reversed.

¶62.    Under Mississippi Rule of Appellate Procedure 22(b), because Lomas is represented by counsel who did not try the case, he must raise this issue if the error is apparent on the record or be barred from raising it in any post-conviction motion.[13] *Branch v. State*, 882 So. 2d 36, 49 (¶18) (Miss. 2004).  Despite the requirement of Rule 22(b), it is still unusual for the appellate court to consider the issue of ineffective assistance of counsel in a direct appeal because there is usually insufficient evidence in the record to do so.  *Ware v. State*, 301 So. 3d 605, 615 (¶45) (Miss. 2020).  Thus, if Lomas's claims of ineffective assistance of counsel are based on facts fully apparent from the record, we will proceed to review them as our

---

[13] Mississippi Rule of Appellate Procedure 22(b) provides:

b) Issues which may be raised in post-conviction proceedings may also be raised on direct appeal if such issues are based on facts fully apparent from the record. Where the appellant is represented by counsel who did not represent the appellant at trial, the failure to raise such issues on direct appeal shall constitute a waiver barring consideration of the issues in post-conviction proceedings.

supreme court did in *Latham v. State*, 299 So. 3d 768 (Miss. 2020). If not, we will deny relief yet preserve the issue for the defendant to raise in a PCR motion.

¶63. "To prevail on an ineffective-assistance-of-counsel claim, the defendant must prove that: (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced the defense of his case." *Havard v. State*, 988 So. 2d 322, 328 (¶13) (Miss. 2006) (*quoting Strickland v. Washington*, 466 U.S. 668, 687 (1984)). To show deficient performance, a defendant must show that counsel's performance "fell below an objective standard of reasonableness." *Ware*, 301 So. 3d at 615 (¶44). "Counsel must have made errors so serious he or she was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Crawford v. State*, 218 So. 3d 1142, 1150 (¶18) (Miss. 2016). But there is a strong presumption that counsel's action were consistent with a chosen trial strategy and was "within the wide range of reasonable professional assistance." *Ware*, 301 So. 3d at 615 (¶44). To prove prejudice to the defense, a defendant must show that "there was a reasonable probability that 'but for' counsel's errors, the result in the trial court would have been different." *Moss v. State*, 977 So. 2d 1201, 1213-14 (¶30) (Miss. Ct. App. 2007). To prove that the "deficient performance prejudiced the defense" requires a showing that "counsel's errors were so serious that they deprived the defendant of a fair trial, a trial whose result is reliable." *Brown v. State*, 306 So. 3d 719, 749 (¶124) (Miss. 2020).

¶64. We may address the merits of an ineffective-assistance-of-counsel claim on direct appeal "if the record affirmatively shows ineffectiveness of constitutional dimensions." *Powell v. State*, 249 So. 3d 355, 360 (¶27) (Miss. 2018). Lomas says that the record here

reflects numerous failures of his trial counsel that rise to that level. This includes failing to object to the State's leading questions to Mary, which we have already found to be proper. Next he raises the failure to object to Pop's lay opinion about Lomas's admission that he French-kissed Mary. We have reviewed this issue above and found that this testimony did not prejudice Lomas. Lomas also points out that his trial attorney also failed to object to portions of the State's closing argument concerning the DNA. But in another section above, we found no misconduct by the State in closing.

¶65.    We do not know why Lomas's attorney did not object to certain testimony, such as the $40,000 line of credit.    But counsel may have wanted to show "Pops'" animus against Lomas and such questioning then was thus part of counsel's trial strategy. *Liddell v. State*, 7 So. 3d 217, 219-20 (¶6) (Miss. 2009) ("In considering a claim of ineffective assistance of counsel, an appellate court must strongly presume that counsel's conduct falls within a wide range of reasonable professional assistance, and the challenged act or omission might be considered sound trial strategy.").

¶66.    But "even where professional error is proven, this Court must determine if there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Brown*, 306 So. 3d at 749 (¶124) (citing *Mohr v. State*, 584 So. 2d 426, 430 (Miss. 1991)). In this case, the jury needed to determine whether Lomas sexually assaulted and fondled Mary. Other testimony about the line of credit and treatment of Lomas's mother were extraneous and useful only for impeachment. We cannot

34

say that any error by Lomas's trial attorney affected the outcome of this case. Accordingly, we find no merit to Lomas's claim of ineffective counsel as shown by the record before us. However, because the parties did not stipulate that the record was adequate to make a finding on direct appeal to the claim of ineffective counsel on other bases which may involve actions or inactions outside the record, our ruling herein is without prejudice to Lomas in the event that he file a petition for post-conviction relief in the future.

### VI. Whether Lomas's convictions should be set aside for cumulative error.

¶67. Individual errors, which are not reversible in themselves, may combine with other errors to make up reversible error when the cumulative effect denies a defendant a fundamentally fair trial. *Johnson v. State*, No. 2017-KA-01483-COA, 2020 WL 1430497, at *8 (¶25) (Miss. Ct. App. Mar. 24, 2020), *cert. denied*, 302 So. 3d 648 (Miss. 2020). This "cumulative error" doctrine necessarily required findings of several harmless errors. In this case, we have found no error and thus the cumulative error doctrine does not apply.

### Conclusion

¶68. For the above and foregoing reasons, we find no error by the circuit court in the proceedings below. Accordingly, we affirm the convictions and sentencing of Lomas.

¶69. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, LAWRENCE, McCARTY AND SMITH, JJ., CONCUR. EMFINGER, J., NOT PARTICIPATING.**

35